Penny Jo BECHTOLD, Plaintiff–Appellant,

v.

PHYSICIANS HEALTH PLAN OF NORTHERN INDIANA, INCORPORATED, Defendant–Appellee.

No. 93–1938.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1993.

Decided March 18, 1994.

---

J. Timothy McCaulay (argued), Helmke, Brams, Boyer & Wagner, Fort Wayne, IN, for plaintiff-appellant.

Stacey L. Katz (argued), Vincent J. Backs, Beers, Mallers, Backs & Salin, Fort Wayne, IN, for defendant-appellee.

Before BAUER and COFFEY, Circuit Judges, and SKINNER, District Judge.*

COFFEY, Circuit Judge.

Penny Jo Bechtold, a female diagnosed and treated for breast cancer, brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover benefits under an ERISA-governed employee welfare benefit plan. In her suit against Physicians Health Plan of Northern Indiana ("PHP"), Bechtold is seeking coverage for high-dose chemotherapy with autologous bone marrow transplantation ("HDC/ABMT"). The case was assigned to a U.S. Magistrate Judge by consent pursuant to 28 U.S.C. § 636(c). On March 18, 1993, the magistrate judge denied the plaintiff's motion for summary judgment but granted the defendant's motion for summary judgment. We affirm.

## BACKGROUND

The parties have stipulated to the relevant facts in this case and legal issues only need be determined. Penny Jo Bechtold is a forty year-old pre-menopausal adult female. She is employed by Magnavox Electronic Systems which maintains a health plan administered by the defendant Physicians Health Plan of Northern Indiana. The plan is an "employee welfare benefit plan" as defined in 29 U.S.C. § 1002(1).

In October, 1991, the plaintiff was diagnosed as having breast cancer and underwent a modified radical mastectomy. The surgery disclosed heavy lymph node involvement with the breast cancer cells. After the removal of the tumor she was treated with

---

* The Honorable Walter Jay Skinner of the District of Massachusetts, sitting by designation.

standard chemotherapy and radiation. Her oncologist recommended that she receive heavy dose chemotherapy with an autologous bone marrow transplant (HDC/ABMT) and referred her to the Cleveland Clinic for this treatment.

HDC/ABMT is a two-step procedure. Physicians first extract ("harvest") the bone marrow cells from the patient's body and place them temporarily in frozen storage. Next, the patient undergoes a cycle of high-dose chemotherapy in hopes of killing the cancer cells. Because the high-dose chemotherapy also attacks the bone marrow cells, it is necessary to withdraw some of the bone marrow prior to undergoing the high-dose chemotherapy. Without initially removing a portion of the bone marrow cells, the high-dose chemotherapy would be lethal because of its myeloblative effect (it destroys bone marrow cells which produce blood cells (red and white) as well as platelets) rendering the patient highly susceptible to infection. After completing the administration of the high-dose chemotherapy, the patient's own ("autologous") stored marrow is reinfused intravenously into the bloodstream to relieve the patient from the toxic effects of the chemotherapy. HDC/ABMT has proven effective in treating certain cancerous blood diseases such as leukemia and Hodgkin's disease but to date it has not been universally accepted treatment for solid-type tumors including breast cancer.

Before Bechtold proceeded with the treatment, PHP advised her that the HDC/ABMT treatment was not a covered service under the plan. Under the policy, a claimant is entitled to a hearing following the denial of a claim, and the plaintiff did in fact appeal the denial of benefits and received a hearing before a committee selected by PHP.[1] The committee *recommended* that even though the insurer had met its obligations to the plaintiff under the contract, that the insurer should change its policy and authorize payment for the procedure because the treatment was reasonable for a patient of Bechtold's age. PHP did not agree with the committee's recommendation, and refused to pay for the treatment stating that it had "lived up to its Contract obligations" under the "clear and unambiguous language in the Contract." PHP advised the plaintiff it was denying her appeal in a letter dated October 2, 1992. With her administrative remedies exhausted, the plaintiff initiated this suit in the U.S. District Court for the Northern District of Indiana.

## ISSUES

On appeal, the plaintiff raises two issues: (1) whether PHP erroneously denied coverage for HDC/ABMT under the plan, and (2) whether she was denied a "full and fair review" of her claim for benefits when PHP declined to accept the recommendation of the complaints committee.

## DISCUSSION

We are aware that Mrs. Bechtold and her immediate family have undoubtedly endured a great deal of heartache, frustration and depression during her battle with cancer.[2] There is no doubt that the policy questions posed in cases like this are of grave concern to all of us, yet we, as a court of law, are called upon to make legal determinations.[3]

---

1. The "Complaint Procedures" section of the policy, contains the following requirements regarding the hearing:

   **Section 5.2 Complaint Hearing.** If the Covered Person requests a hearing, a committee shall be appointed by the Chief Executive Officer of PLAN, consisting of at least one PLAN Participating Physician, at least one consumer Enrollee of PLAN, and a representative of PLAN management. The complaint committee shall be empowered to resolve or recommend the resolution of the complaint.

2. Fortunately for Mrs. Bechtold she has secondary insurance that paid for the treatment and thus this action will merely determine which of two insurers will pay for the treatment.

3. In *Harris v. Mutual of Omaha Cos.*, 1992 WL 421489, 1992 U.S.Dist. Lexis 21393 (S.D.Ind. Aug. 26, 1992), aff'd, 992 F.2d 706 (7th Cir. 1993), a similar case of a claimant seeking coverage for HDC/ABMT, U.S. District Judge Tinder succinctly summarized the problem facing courts in these difficult claims for medical coverage:

   Despite rumors to the contrary, those who wear judicial robes are human beings, and as persons, are inspired and motivated by compassion as anyone would be. Consequently, we often must remind ourselves that in our official capacities, we have authority only to issue rulings within the narrow parameters of the law and the facts before us. The temptation to go about, doing good where we see fit,

The issue in this case is very straightforward: Does the PHP benefit plan authorize coverage of HDC/ABMT? This is a matter of contract interpretation that does not implicate the broader policy issues involved in whether insurers *should* cover medical procedures that are presently of unknown medical value and extremely costly.

■ A claim for benefits under an ERISA-governed plan "is a matter of contract interpretation. When there are no triable issues of fact, we have held that '[c]ontract interpretation is a subject particularly suited to disposition by summary judgment.' "[4] *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir.1993) (quoting *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1333 (7th Cir.1988)). The interpretation of an unambiguous contract is a question of law for the court. *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir.1989). "A term is [only] ambiguous if it is subject to reasonable alternative interpretations." *Hickey*, 995 F.2d at 1389 (quoting *Taylor v. Continental Group*, 933 F.2d 1227, 1232 (3rd Cir.1991)).

■ The parties have devoted considerable time arguing what the proper standard of review is in this case. In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), the United States Supreme Court ruled that the denial of benefits by an ERISA plan administrator must "be reviewed under the *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan." *Id.* at 115, 109 S.Ct. at 956. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' "

*Id.* (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). The plaintiff argues that because PHP was operating under a conflict of interest (i.e., PHP stood to gain a greater profit if the claim was denied) we should grant less deference to PHP's determination that HDC/ABMT is experimental. We need not decide what level of deference to give to the defendant's interpretation of the contract term because under the facts in this case, even applying *de novo* review, the clear and unambiguous language of the policy dictates that the defendant, Physicians Health Plan of Northern Indiana, properly denied coverage for the HDC/ABMT treatment.

*Denial of Coverage*

In part, the Plan provides:

" 'Experimental or Unproven Procedures' means any procedures, devices, drugs or medicines or the use thereof which falls within any of the following categories:

1. Which is considered by any government agency or subdivision, including but not limited to the Food and Drug Administration, the Office of Health Technology Assessment, or *HCFA Medicare Coverage Issues Manual* to be:

   a. experimental or investigational;

   b. *not considered reasonable and necessary;* or

   c. any similar finding;

2. Which is not covered under Medicare reimbursement laws, regulations or interpretations; or

3. Which is not commonly and customarily recognized by the medical profession

and to make things less difficult for those who come before us, regardless of the law, is strong. But the law, without which judges are nothing, abjures such unlicensed formulation of unauthorized social policy by the judiciary.

Plaintiff Judy Harris well deserves, and in a perfect world would be entitled to, all known medical treatments to control the horrid disease from which she suffers. In ruling as this court must, no personal satisfaction is taken, but that the law was followed. The court will have to live with the haunting thought that Ms.

Harris, and perhaps others insured by the Mutual of Omaha Companies under similar plans, may not ultimately receive the treatment they need and deserve. Perhaps the question most importantly raised about this case, and similar cases, is who should pay for the hopeful treatments that are being developed in this rapidly developing area of medical science?

4. As we stated above, both parties filed motions for summary judgment.

in the state of Indiana as appropriate for the condition being treated.

PLAN reserves the right to change, from time to time, the procedures considered to be Experimental or Unproven. Contact PLAN to determine if a particular procedure, treatment, or device is considered to be Experimental or Unproven."

(Emphasis added).

The HCFA Medicare Coverage Issues Manual (which is referenced in the PHP Plan) provides in section 35–31:

"C. *Autologous Bone Marrow Transplantation (Effective for Services Performed on or After 04/28/89).*—Autologous bone marrow transplantation is a technique for restoring bone marrow stem cells using the patient's own previously stored marrow.

\*     \*     \*     \*     \*     \*

2. *Noncovered Conditions.*—Insufficient data exist to establish definite conclusions regarding the efficacy of autologous bone marrow transplantation for the following conditions:

● Acute leukemia in relapse (ICD–9–CM codes 204.0, 205.0, 206.0, and 208.0);

● Chronic granulocytic leukemia (ICD–9–CM code 205.1); or

● *Solid tumors* (other than neuroblastoma) (ICD–9–CM codes 140–199).

*In these cases, autologous bone marrow transplantation is not considered reasonable and necessary within the meaning of § 1862(a)(1)(A) of the Act and is not covered under Medicare."*

(Emphasis added).[5]

The plaintiff does not challenge the language of the HCFA Medicare Coverage Issues Manual but argues that the phrase in the Plan that PHP "reserves the right to change, from time to time, the procedures considered to be Experimental or Unproven" creates an obligation on the part of PHP to cover the contested treatment in light of recent medical research endorsing the procedure for solid tumors like breast cancer. She argues that the "right to change" implies that PHP will update the list of experimental treatments as medical research and science allows. Bechtold claims that an unsuspecting lay person would conclude that the phrase "right to change" implies that PHP's intent was to stay current with advances in the medical sciences rather than to hide behind outdated or inapplicable guidelines and therefore if the treatment is no longer experimental—as the plaintiff argues—she is entitled to coverage. Bechtold further argues that because the phrase "right to change" is not defined anywhere in the contract, it is ambiguous.

We are of the opinion that Bechtold is attempting to create an ambiguity in the contract language where no ambiguity exists. *Phillips v. Lincoln National Life Ins. Co.,* 978 F.2d 302 (7th Cir.1992). The "right to change" clause is merely a reservation of rights and is not "subject to reasonable alternative interpretations." *Hickey,* 995 F.2d at 1389. The "right to change" the classification of procedures certainly does not obligate PHP to reclassify hourly, weekly, monthly or annually whether a treatment should be covered on the basis of competing views of medical experts (oncologists). Rather, PHP chose to link the experimental nature of a treatment to the neutral (third party) determination of the medical experts responsible for drafting the HCFA Medicare Coverage Issues Manual. Clearly, PHP's intent was to avoid a case-by-case battle of the experts in which PHP would be required to re-evaluate covered treatments each time a self-proclaimed "expert" publishes a new article. As recited above, PHP chose to rely on the neutral HCFA Medicare Coverage Issues Manual to determine whether a procedure is "experimental."[6] The section of the policy that defines experimental procedures states

5. Breast cancer falls under the solid tumor exclusion.

6. The HCFA Medicare Coverage Issues Manual is updated when new medical data becomes available and the updates are published quarterly in the Federal Register. *See* Joint Exhibit No. 7. The provision relating to autologous bone marrow transplants for solid tumors (breast cancer) was published in the Federal Register on June 11, 1992, *see* 57 Fed.Reg. 24797, 24804 (June 11, 1992), and was in effect at all times relevant to this proceeding (Bechtold was denied coverage in October 1992).

"[e]xperimental or [u]nproven [p]rocedures means any procedure[ ] . . . [w]hich is considered by . . . [the] HCFA Medicare Coverage Issues Manual to be . . . not considered reasonable and necessary. . . ." The HCFA manual clearly states that for solid tumors, including breast cancer, "autologous bone marrow transplantation is not considered reasonable and necessary. . . ." This language is clear and unambiguous. *See Awbrey v. Pennzoil Co.,* 961 F.2d 928, 930–31 (10th Cir.1992) ("[a] court is without authority to alter or amend contract terms and provisions absent an ambiguity in the contract * * * [w]e will not read into the [contract] a requirement that, by its clear and unambiguous language, is absent"); *Senn v. United Dominion Indust., Inc.,* 951 F.2d 806, 818 (7th Cir.) ("we are not permitted to allow our sympathies and desires to vitiate clear principles of contract and labor law, and in particular, we refuse to amend the clear terms of the health and welfare benefits contained in the [agreement]"), *reh'g en banc denied,* 962 F.2d 655 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993); *Heller v. Equitable Life Assur. Soc.,* 833 F.2d 1253, 1257 (7th Cir. 1987) ("In the absence of a clear, unequivocal and specific contractual requirement [placing a duty on a party,] we refuse to order the same.[7] To hold otherwise and to impose such a requirement would, in effect, enlarge the terms of the policy beyond those clearly defined in the policy agreed to by the parties.").

In effect, the plaintiff is arguing that PHP *should* cover the treatment. Clearly there is no authority for such a proposition under ERISA which does not dictate what a plan such as the PHP plan before us *should* cover. *Hickey,* 995 F.2d at 1393 ("Congress never intended ERISA to dictate the *content* of welfare benefit plans, much less for the federal courts to determine the *content* of such plans . . . the discretion to make decisions concerning the content of the Plan rests with the Plan administrator"); *Sisters of the Third Order v. SwedishAmerican Group Health Benefit Trust,* 901 F.2d 1369, 1372 (7th Cir.1990) ("nothing in ERISA requires a plan to cover any particular injuries"). Therefore, we hold that the language of the PHP Plan excludes coverage for HDC/ABMT as a treatment for breast cancer.

### Full and Fair Review

Bechtold's second argument is that she was denied full and fair review under 29 U.S.C. § 1133 because PHP refused to accept the recommendation of its own complaints committee and instead denied the benefits based on the Plan Chief Operating Officer's disagreement with the committee's recommendation. We cannot agree with Bechtold's argument on this account because a review of the letter from PHP denying the benefits (the October 2, 1992 letter) makes clear that the committee recognized that the HDC/ABMT treatment was not covered under the plan. The committee, however, recommended a change of policy by the insurer to allow coverage of the procedure because:

1) the procedure was not experimental and PHP has an express intent of providing reasonable care for patients of this type;

---

7. In *Heller,* the insurance company was attempting to require the insured (a physician) to undergo surgery to correct carpal tunnel syndrome, however, there was no such requirement in the disability insurance contract. We noted that the plaintiff "entered into a mutually binding private insurance contract for professional disability insurance with [the defendant] and obligated himself to pay a substantial bi-annual premium. In the absence of an express provision obligating the insured to undergo surgery, we refuse to place such a requirement upon the insured." 833 F.2d at 1258. We also added that

"The insurance company seeking to condition coverage on its insureds' acquiescence to undergo surgery to minimize the extent of their disabilities, as well as the financial loss to the insurer, need only incorporate a specific re-

quirement to that effect in the policy, and we would not hesitate to enforce the same. On the other hand, insurers who fail to include this express surgical contractual requirement, and who refuse to cover an insured after entering into a binding and enforceable agreement after accepting substantial premiums, in circumstances such as those before us, cause problems not only for the insured, but for the insurance industry as well. Insurance companies, members of a service industry, must recognize that, like their insureds, they have corresponding duties and obligations under the policy and must conduct themselves accordingly instead of attempting to rely on the courts to correct their own deficiencies in underwriting and/or careless policy drafting."
*Id.* at 1259–60 (footnote omitted).

2) Medicare supporting claims for this type of non-covered condition, is not that of a patient of Ms. Bechtold's age;

3) supportive data suggests the proposed treatment as very appropriate.

The committee was called upon to make a recommendation within the parameters of the contract entered into between the insured and the insurance carrier. The committee found that according to the language in the policy that the parties agreed upon, Bechtold was not entitled to coverage. This should have signaled the end of their report but they chose to go beyond their authority and responsibility and recommend a material policy reformation. *See* 29 U.S.C. § 1133 and Art. 5 of PHP Plan (referring to resolution of the claim not reformation of the plan to cover previously noncovered services). The only authority vested in the committee was to recommend whether a specific claim for benefits had been properly denied based upon the language of the policy; it was not free to cast aside the agreed upon terms of the insurance contract. Based on the clear and unambiguous terms of the policy, we agree with the defendant that the Plan did not authorize reimbursement for the procedure (HDC/ABMT for breast cancer) and that the complaints committee lacked authorization to recommend a significant reformation of the Plan (i.e., the Plan *should* cover the treatment). Accordingly we hold that the plaintiff received a full and fair review as required under 29 U.S.C. § 1133.

## CONCLUSION

As stated above, cases of this nature pose troubling social as well as ethical questions that go well beyond the legal issues. As a court of law we are empowered to decide legal issues presented by specific cases or controversies. The greater social questions must be decided by the political branches of government which can engage in "legislative fact-finding" and "benefit from public hearings and constituent expression of opinion." *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 324, 294 N.W.2d 437, 469 (1980) (Coffey, J., dissenting); *see also Welsh v. Boy Scouts of America,* 993 F.2d 1267, 1270–71 (7th Cir.) ("[w]e must refuse[ ] to infringe on the legislative prerogative of enacting statutes to im-

plement public policy.... The problems of public policy ... are for the legislature....") (quoting *Wangen,* 97 Wis.2d at 324, 294 N.W.2d at 469) (Coffey, J., dissenting)), *cert. denied,* —— U.S. ——, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). Chesterfield Smith, the former president of the American Bar Association once stated in a Law Day address: "courts are being asked today to solve problems for which they are not institutionally equipped.... The American public perceives the courts as a jack-of-all trades available to furnish the answer to whatever may trouble them." *Wangen,* 97 Wis.2d at 323, 294 N.W.2d at 469 (Coffey, J., dissenting). The question of what procedures insurance companies should cover is just the type of problem to which Mr. Smith was referring.

In order to resolve the question of whether health insurance providers should cover treatments like HDC/ABMT, the prudent course of action might be to establish some sort of regional cooperative committees comprised of oncologists, internists, surgeons, experts in medical ethics, medical school administrators, economists, representatives of the insurance industry, patient advocates and politicians. Through such a collective task force perhaps some consensus might· be reached concerning the definition of experimental procedures, as well as agreement on the procedures, which are so cost prohibitive that requiring insurers to cover them might result in the collapse of the healthcare industry. While such a committee would in no way be a panacea for our skyrocketing health care costs, it may help to reduce the incidence of suits in which one "expert" testifies that a procedure is experimental and another equally qualified "expert" testifies to the opposite effect. This so called battle of the experts occurs all too frequently in federal court.

Under the present state of the law, we are bound to interpret the language of the specific contract before us and cannot amend or expand the coverage contained therein. *See supra* at 327 (citing *Awbrey,* 961 F.2d at 930–31; *Senn,* 951 F.2d at 818; *Heller,* 833 F.2d at 1257). In this case, that contract is unambiguous and clearly states that HDC/ABMT is not a reasonable or necessary treatment

for solid tumors such as breast cancer. Accordingly, the judgment of the magistrate is

Affirmed.