## AETNA LIFE INSURANCE COMPANY, Plaintiff,

v.

## AMERICAN NATIONAL BANK & TRUST COMPANY OF CHICAGO, as Trustee, etc., et al., Defendants.

No. 95 C 5926.

United States District Court,
N.D. Illinois,
Eastern Division.

March 4, 1997.

**816**

Alan I. Greene and Lora E. Minichillo of Schwartz & Freeman, Chicago, IL, for Plaintiff.

Sheldon Davidson, Marilee Roberg and Steven M. Austermiller of Pedersen & Houpt, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

In this diversity action Aetna Life Insurance Company ("Aetna") seeks payment of retrospective premiums that it claims are owed to it by Bridge Products, Inc. and American National Bank and Trust Company as Trustee of the latter's Employee Benefit Trust (for convenience, both defendants are collectively termed "Bridge," treated as a singular noun) pursuant to a split-funded insurance arrangement. Bridge has now moved for summary judgment under Fed. R.Civ.P. ("Rule") 56. Both sides have submitted statements called for by this District Court's General Rule ("GR") 12(M) and 12(N), adopted to highlight the existence or nonexistence of any material fact disputes.[1]

At this point Bridge's motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, the motion is granted and this action is dismissed.

## Judgment Standards

■ Under familiar Rule 56 principles, a party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Ca-*

*trett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). This Court is called upon to draw inferences in the light most favorable to the non-moving party, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991)).

■ When a case turns on interpretation of an unambiguous contract term, it is ripe for final disposition at the summary judgment stage (*Bechtold v. Physicians Health Plan of N. Ind., Inc.,* 19 F.3d 322, 325 (7th Cir.1994) and cases cited there). If however the contact is ambiguous and its meaning must be derived from conflicting extrinsic evidence, the question is a factual one best left to the trier of fact (*LaSalle Nat'l Trust, N.A. v. ECM Motor Co.,* 76 F.3d 140, 145 (7th Cir.1996)).

## Background [2]

Effective September 1, 1984 Bridge and Aetna entered an arrangement for a group insurance policy that reflected a change from a conventionally insured policy to a "split-funded" arrangement with a retrospective premium (B.12(M) 15; A. 12(N)(b)(3) ¶ 17). That arrangement was memorialized in two documents in addition to the underlying group policy itself: the Split Funded Agreement ("SF Agreement," A. Ex. B) and the one-page Retrospective Premium Agreement ("RP Agreement," A. Ex. C), under the combination of which documents Aetna agreed to process claims while Bridge agreed (in addition to paying Aetna a premium) to be responsible for payment of claims each month up to a specific liability limit (A.Mem.4). As both parties agree (A.12(N)(b)(3) ¶ 2):

1. In part Bridge's counsel have ignored the fundamental difference between an answer (a responsive *pleading*) and a response under GR 12(N) or 12(M) (which demands references to the *factual* support for any disputes). Thus Bridge's response to Aetna's GR 12(N) statement includes some simple statements of "Denied" and some disclaimers of information sufficient to form a belief, in each instance without any references to the record before this Court. Those insufficient responses have no effect whatever, so that Aetna's corresponding assertions that do have rec-

ord support must be credited on the current motion.

2. This opinion refers to Bridge's GR 12(M) statements as "B. 12(M) ¶—" and to Aetna's additionally numbered GR 12(N) statements as "A. 12(N)(b)(3) ¶—." Unless otherwise noted, the statements cited in this opinion were either explicitly or implicitly admitted in the corresponding response. Those same "B." and "A." abbreviations will be employed for the parties' other filings.

The purpose of the insurance arrangement that Bridge entered into with Aetna was for Bridge to pay Aetna a basic monthly premium covering claims handling and administrative and accounting services and for Aetna to establish a method for funding claims that would provide certain cash flow, tax avoidance, and other incidental benefits to Bridge.

For each contract year Aetna calculated a base monthly liability limit that determined Bridge's maximum payment toward claims made under the policy during the first month of that year (B.12(M) ¶¶ 8–10). Then Bridge's aggregate liability limit for each later month during that contract year was equal to the monthly base amount plus any excess liability limit not used by claims from the previous month (B.12(M) ¶ 11). If however the claims for any month exceeded Bridge's aggregate liability limit for that month, Aetna paid the excess [3] and Bridge's aggregate liability limit for the next month then equaled the base amount (B.12(M) ¶ 11).

Pursuant to the RP Agreement, at the end of each contract year Aetna generated experience accounting statements [4] for an annual accounting of the payments made under the SF Agreement (A.12(N)(b)(3) ¶ 8; B. 12(M) ¶ 15). Both parties agree that:

1. If in any month during the contract year Aetna paid claims in excess of the existing aggregate liability limit, that would be considered a deficit for accounting purposes (B.12(M) ¶ 13).

2. If the total of the deficits in any contract year was *less* than the amount of unused aggregate liability limit at the end of the contract year, the deficit would be recaptured in the form of a retrospective premium that Aetna could "call" from the

unused liability limit (A. Mem. 5; B. Mem. 6; RP Agreement).

Where Aetna and Bridge disagree, however, is as to how a contract year's total deficit should be handled when it is *greater* than the amount of unused liability limit remaining at the end of the year.

Bridge owed a retrospective premium in only two of the first six years of the arrangement, and on neither of those occasions did that payment exceed the amount of unused liability limit (9/1/86–8/31/87 Statement; 9/1/87–8/31/88 Statement). For the 9/1/90–8/31/91 contract period, however, the deficit exceeded Bridge's unused liability limit for the first time (A.12(N)(b)(3) ¶ 6; Lambert Aff. Ex. 1). Aetna seeks to recover part of that $154,009 [5] deficit by carrying it forward to the next (and final) abbreviated contract period [6] and by thus offsetting against it the $96,669 of unused liability limit at the end of that contract period (A.12(N)(b)(3) ¶ 6). Bridge rejects that claim, arguing that the RP Agreement does not allow deficits to be carried forward to a later contract period and that Aetna therefore remains responsible for all claims paid beyond Bridge's liability limit for the 9/1/90–8/31/91 contract period (B.Mem.5–6).

### *Contract Interpretation*

■ For cases sounding in diversity, the *Erie v. Tompkins* mandate to turn to state law for the substantive rules of decision includes the application of the forum's choice of law doctrines (*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and its numerous progeny). Neither Aetna nor Bridge addresses that subject—instead their memoranda simply cite Illinois' internal law. In that situa-

---

3. Aetna claims in A. 12(N) ¶ 12 that a different option was used during the latter part of the insurance arrangement whereby Aetna did not pay the excess each month, but that timing difference does not affect the dispute involved in this Rule 56 motion (as Aetna concedes in A. Mem. 4 n. 4).

4. Those accounting statements, located in the record at Lambert Aff. Ex. 1, are referred to in this opinion by the contract periods that they cover. For example, the first annual accounting statement is cited "9/1/84–8/31/85 Statement."

5. Although A. 12(N)(b)(3) 46 says that the deficit at the end of that contract year was $145,009 (and Bridge admits that in its corresponding response), that figure is clearly a typographical error, as shown by the 9/1/90–8/31/91 Statement to which the GR 12(N) statement refers.

6. That period was only four months long because Bridge cancelled the insurance effective December 31, 1991 (A.12(N)(b)(3) ¶ 6).

tion, as *Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir.1991) teaches:

> The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.

Following *Wood,* this opinion applies Illinois substantive law to the contract issue at hand.[7]

In that respect *In re Doyle,* 144 Ill.2d 451, 467, 163 Ill.Dec. 515, 522, 581 N.E.2d 669, 676 (1991), quoting *Schek v. CTA,* 42 Ill.2d 362, 364, 247 N.E.2d 886, 888 (1969), instructs:

> The objective to be reached "in construing a contract is to give effect to the intention of the parties involved." Provided no ambiguity exists within the contract, the intentions of the parties, at the time the contract was formed, must be ascertained from the language of contract.

*Shelton v. Andres,* 106 Ill.2d 153, 158, 87 Ill.Dec. 954, 957, 478 N.E.2d 311, 314 (1985),[8] quoting *Shadden v. Zimmerlee,* 401 Ill. 118, 123, 81 N.E.2d 477, 480 (1948) (citations omitted), elaborates on the court's search for intention:

> Generally, where there is no ambiguity, courts will look to the deed itself as the only criterion of the intention of the parties. However, it is also true that an instrument should be given a fair and reasonable interpretation based on consideration of all its language and provisions. In attempting to arrive at a fair and reasonable construction, "courts are not confined to a strict and literal construction of the language used, when such construction will frustrate the intention of the parties, gathered from a consideration of the whole instrument."

If the terms of a contract are unambiguous, the only source for deriving the parties' intent is the instrument itself. If, however, the contract language is ambiguous (if it may reasonably be construed in different ways), extrinsic facts may be used to determine the contract's meaning (*La Throp v. Bell Fed. Sav. & Loan Ass'n,* 68 Ill.2d 375, 383, 12 Ill.Dec. 565, 569, 370 N.E.2d 188, 192 (1977)).

*Existence or Nonexistence of Ambiguity*

As the Illinois caselaw directs, the necessary inquiry into the parties' intentions begins with the contractual language itself. Bridge focuses on the only language in the RP Agreement that expressly addresses deficits (A. Ex. C, emphasis added):

> If such experience accounting statements indicate that the coverage is in a deficit financial position as of the end of the period, a retrospective premium shall be payable by the Policyholder [Bridge] within 31 days following the date notice of such due premium is provided by Aetna. The amount of any such retrospective premium payment shall be the lesser of:
>
> a) the amount of the deficit shown in Aetna's experience accounting statements, or
>
> b) (i) The amount by which the Policyholder's aggregate Liability Limit for that portion of the coverage administered under Agreement Form GR–SFGP effective September 1, 1984 [the SF Agreement] exceeds the amount of the claims paid directly by the Policyholder and charged against such Liability Limit as shown in such experience accounting, whether or not Agreement Form GR–SFGP has been terminated, and

---

7. Unlike *Wood,* where the contract was silent as to choice of law, here the contract contains a provision stipulating that Connecticut law applies. That provision does not alter the result, because neither party has raised it and, as *Wood,* 942 F.2d at 427 says:

> With the principal exception of issues going to the subject-matter jurisdiction of the federal courts, these courts are not required to and ordinarily do not create issues where the parties agree.

8. Although *Shelton* involved interpretation of a mineral rights reservation in a deed—which, if its terms had not been the subject of negotiation, could arguably present a situation different from construing a mutually negotiated insurance contract—the opinion's statement of general contract interpretation principles is applicable to the case at hand.

(ii) the amount following termination of Agreement Form GR–SFGP, provided the Policyholder has elected to have the Terminal Liability Limit apply to claims paid following such termination, but which the Policyholder's Terminal Liability Limit exceeds claims paid directly by the Policyholder and charged against such Terminal Liability Limit.

Bridge would have that provision apply in literal terms for the 9/1/90–8/31/91 contract period: Although a deficit of $154,009 accrued during that year, Bridge says that it did not owe Aetna anything because Bridge had no remaining unused liability limit under (b)(i) and because (b)(ii) was not applicable. Thus the amount of the retrospective premium would be zero, and Aetna would have no right to recapture the deficit. That reading certainly tracks the contractual language.

Aetna disagrees with that interpretation, however: It argues that while the retrospective premium for the 9/1/90–8/31/91 accounting period was zero, the unpaid deficit would be carried forward to the next contract period, where it could be applied against any premium surplus or unused liability limit in that year. Aetna contends that the RP Agreement does not address the question whether remaining deficits not covered by the retrospective premium may or may not be carried forward, so that the RP Agreement is ambiguous on that point and this Court should therefore resort to extrinsic evidence to determine the parties' intent.

That argument is somewhat akin to the classic exchange between Colonel Ross and Sherlock Holmes in Arthur Conan Doyle's *Silver Blaze:* [9]

"Is there any point to which you would wish to draw my attention?"

"To the curious incident of the dog in the nighttime."

"The dog did nothing in the nighttime."

"That was the curious incident," remarked Sherlock Holmes.

But like that bit of Holmesian logic, Aetna's position depends on the premise that the parties' documentation should have been expected to deal with the subject of accountability for year-end deficits with even greater particularity than the admittedly detailed provisions of the RP Agreement as to the payment of retrospective premiums.

■ For that purpose it is appropriate to look not only to the RP Agreement but also to the SF Agreement, which was entered into contemporaneously with the RP Agreement in the course of the same transaction. Multiple documents created in that manner "will be considered together and construed with reference to one another because they are, in the eyes of the law, one contract" (*In re Estate of Croake,* 218 Ill.App.3d 124, 125, 161 Ill.Dec. 209, 210, 578 N.E.2d 567, 568 (1991)). And each of the two documents (and no other) addresses the subject of payments and credits running from either party to the other.

In its preamble, the SF Agreement states this as one of the purposes of that contract:

[T]he Contractholder [Bridge] wishes to accept liability on a non-insured basis for payment of such benefits described in the Group Policies, subject to certain maximum payment limits as described herein.

Later SF Agreement § 4(a) states:

The Contractholder shall be liable for, and agrees to provide funds sufficient to satisfy, all Plan Benefits including Plan Benefits that become due prior to termination of the Agreement but that are not yet paid at termination. While the Agreement is in force, payments by the Contractholder for Plan Benefits will be subject to a maximum payment (hereinafter referred to as the Liability Limit).

But as indicated earlier, the SF Agreement speaks *only* of payments by the Contractholder (Bridge), and not of any payments or repayments to be made by Aetna. Indeed, even as to those Bridge payments the SF Agreement speaks only of setting a *maximum* level—never a minimum (as might perhaps be called for if any carryover refunds of deficits by Aetna were required). And the *only* payment that the SF Agreement calls on Bridge to make at the beginning of a contract year is the amount of the monthly

---

**9.** That was the first of the 11 short stories in *The Memoirs of Sherlock Holmes.*

base "Liability Limit"—not that amount (or any other amount) diminished by the preceding year's deficit.

In fact, Aetna's basic argument that the contract documents are to be construed as providing for a continuous-flow calculation, rather than by looking at each contract year as a discrete period—an argument that is the key to Aetna's position that a year-end deficit should be carried over to apply against next year's surplus—is torpedoed by the manner in which Aetna itself structured SF Agreement § 4(b), which spells out how each contract month's "Liability Limit" was to be calculated. As stated earlier, each month's Liability Limit began with the monthly base amount, subject to a possible increase if the loss experience in the preceding month had been favorable. But note how that potential add-on was framed (emphasis added):

> (ii) shall be an amount equal to the Liability Limit for the preceding contract month less the amount of Plan Benefits actually charged against the Liability Limit in that month, but not less than zero, *except that this Item (ii) shall be zero with respect to the Liability Limit for the first contract month of a contract year.*

That unambiguously conforms to the plain reading of the RP Agreement that has already been discussed in this opinion.

Thus the combination of the SF Agreement and the RP Agreement, like the latter document alone, must be viewed as unambiguous as to the extent of Bridge's obligation to make payments to, or otherwise to account to, Aetna. As crafted by Aetna itself, they constitute an integrated and comprehensive set of provisions spelling out Bridge's payment obligations. And their total silence on the subject of carrying forward any contract year-end deficits is not equivalent to that of the dog that did not bark in the night—it signifies instead that no such carryforwards are called for.

■ As against that conclusion, what does Aetna tender by way of extrinsic evidence—evidence that it will be recalled could come into play only if the contract were ambiguous (*La Throp*, 68 Ill.2d at 383, 12 Ill.Dec. at 569, 370 N.E.2d at 192)? Even on that failed assumption of contractual ambiguity, the several matters adduced by Aetna do not carry the day. Here they are:

1. On the annual experience accounting statements that Aetna generated pursuant to the RP Agreement, in addition to a column for "Current Policy Period Experience Balance," there were columns for "Prior Balance Forward" and "Cumulative Balance" (Lambert Aff. Group Ex. A) which Aetna claims were for the express purpose of carrying forward deficits and would otherwise be redundant (A.Mem.7).

2. In 1989, when Bridge hired insurance consultant Gretchen McAlinden ("McAlinden") to review the arrangement with Aetna, McAlinden wrote a letter to Bridge asking questions about the arrangement, including: "How are losses carried forward under the contract?" (A.Ex. N). Upon reviewing that letter with McAlinden, Bridge employee Jeanette Kruse Baron ("Kruse") noted in the margin that the question referred to "the amount that Aetna recoups," about which Kruse testified: "to me that means Aetna gets some money. That's why I made that note" (Kruse Dep. 147–48).

3. Several Aetna employees testified that for split-funded arrangements they were trained to carry deficits forward (Kemp Dep. 21–22, Robinson Dep. 59–60) and that that was the standard practice with other clients with similar arrangements (Lambert Dep. 107–11, Kemp Dep. 70–74, Robinson Dep. 61–64).

4. In three memoranda prepared for Bridge by its insurance consultant Jim Mascarella ("Mascarella"), addressing the reasons why Bridge should not have to pay the retrospective premium that Aetna demanded after the 9/1/91–12/31/91 contract period, there was no mention of Bridge avoiding liability on the ground that the arrangement did not permit deficits to be carried forward (A.Exs.O, P, Q).

5. In describing split-funded insurance arrangements (also known as participating arrangements), II Jerry Rosenbloom, *Handbook of Employee Benefits: Design,*

*Funding and Administration* 153 (3d ed.1992) states (A.Ex. E): [10]

> In a *participating insurance arrangement* the employer shares in its favorable or unfavorable financial experience during the policy period. If the financial experience is favorable—that is, the claims and administrative costs are less than the premium paid during the policy period—the employer receives the surplus premium from the insurance company at the end of the policy year. If the financial experience is unfavorable— if the claims and administrative costs are greater than the premium paid during the policy period—the plan is considered to be in a deficit balance equal to the difference between total plan costs and paid premium. In most instances, this deficit balance is carried forward by the insurance company to be recovered in future years of favorable experience.

But even before this opinion turns to a review of Aetna's proffered matters one by one, it should be noted as to this fifth one that Aetna not only glosses over (without mentioning) the "In most instances ..." qualifier contained in that excerpt, but it omits entirely any reference to the portion of the same chapter a few pages on (*id.* at 159–60, emphasis in original) that directly undercuts Aetna's position and supports this opinion's plain-meaning reading of the parties' contractual arrangements:

> In some participating insurance arrangements, the insurance company contractually *cannot* recover deficit balances from future employer surplus balances but still shares annual surplus balances with the employer. This type of arrangement reduces the insurance company's risk of an employer to switching insurance companies before repaying a deficit balance. Also, this type of participating insurance arrangement may be more favorable for the employer because it participates only in years of positive financial results. The trade-off will be a higher annual risk charge or underwrit-

ing margin compared to an arrangement that participates in both year-end surplus and deficit-balance situations.

If only to demonstrate that Aetna could not prevail even if it were appropriate (as it is not) to turn from the clear contractual language to some consideration of those items of extrinsic evidence, this opinion will address each of them in turn. As indicated earlier, neither singly nor in combination do those matters call for a different conclusion.

First, the "Prior Balance Forward" columns on the experience accounting statements were simply entries that reflected any within-a-contract-year calculation called for by the plain language of the parties' agreements *until* the issue of the unabsorbed deficit arose in the 1990–91 contract period. Nothing in the parties' experience until then could fairly have conveyed the message *to Bridge* that Aetna had a belief (assuming that it did) that deficits may be carried forward to a *new* contract year. So far as Bridge was apprised, the function of such columns was exactly the one that they served in each of the first two years with a year-end-deficit—to reflect any deficit that had accrued in the prior period of the same contract year, and relatedly to reflect the retrospective premium that Bridge had to pay to satisfy its portion of that within-the-same-year liability (see 9/1/86–8/31/87 Statement and 9/1/87–8/31/88 Statement).

Second, McAlinden's query as to how losses were "carried forward" under the policy— an inquiry that it will be recalled was made several years after the parties' contracts were entered into and thus cannot be taken as evidence of the parties' relevant intent when they made their deal—is itself ambiguous at best. It could well have related to the notion of the within-a-contract-year carry forward that the contracts unquestionably called for by their terms. But most importantly, as just said here, it is not probative on the issue of *Bridge*'s original intent at the relevant date: the time of contracting.

---

**10.** Although A. Ex. E comprises only the cover and Chapter 47 of the *Handbook,* it appears that Rosenbloom is the volume's editor, while the chapter quoted from here is authored by Richard L. Tewksbury, Jr. (whoever that may be). This opinion will speak to the evidentiary problems posed by the Exhibit later.

Third, the averments by Aetna employees that they were trained to handle such contracts a certain way or that they treated other clients similarly is also not evidence of what Bridge may have known or understood at the time of contracting. Unless communicated to Bridge, such information (on the assumption most favorable to Aetna) reveals only Aetna's desired result, not the actual deal that it forged with Bridge.

Fourth, it is also unpersuasive that Bridge's insurance consultant Mascarella—not shown by the record to be a lawyer at that—did not raise the issue whether deficits could properly be carried forward ·when he advised Bridge on this contract dispute. As the *Handbook* (discussed both earlier and in the next paragraph) reflects, split-funded arrangements come in two flavors, one of the type for which Aetna contends here and the other of a type consistent with the language of the agreements at issue in this litigation. This Court has no way of knowing what background Mascarella brought to the issue, but there is nothing whatever to suggest that he had *any* information about Bridge's understanding of the contract at its formation. And as for the actual meaning of the agreements, it is of course this Court's role—with the input of the parties' counsel—to resolve that question.

■ Fifth and finally, the *Handbook* not only fails to save the day for Aetna, but actually adds credence to Bridge's position. As already said, in addition to ignoring the qualifying phrase as to its own contention (something that negates any possible argument as to a uniform industry custom and usage that could somehow bind Bridge—a doubtful notion in itself, given Bridge's position as an outsider to the industry), Aetna turns a blind eye to the fact that the same chapter goes on to describe split-funded arrangements where deficits *cannot* be carried forward, thus supporting Bridge's and this Court's reading of the contractual language at issue here.[11]

■ It is worth adding a general point, in the relevant universe of contract interpretation, about Aetna's proffer of such extrinsic evidence. To be sure, sometimes parties are not bound by the plain meaning of language, as where they adopt a special vocabulary or where a *custom or trade imparts special,* nonobvious meaning to terms that would otherwise appear obvious to the noninsider (see, e.g., *FDIC v. W.R. Grace & Co.,* 877 F.2d 614, 620–21 (7th Cir.1989)). But neither of those circumstances is at work here. Instead Aetna would have this Court ignore the agreements' plain language in favor of another meaning that it says reflects the arrangement that it wanted to enter into.

But leaving aside the obvious perils presented by allowing such post-hoc explanations, whether Aetna *should* have entered into the agreement that it drafted is not the point. If Aetna made a bad deal in terms of potential consequences that it did not think through fully, too bad. If instead it claims that it did not *intend* the clear import of the contract's language, it runs head on into the classic objective theory of contracts so strikingly articulated by Judge Learned Hand in his famous aphorism in *Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913):

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else that the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.

*Conclusion*

In sum, Aetna has failed to raise any material issue of fact as to the meaning of the

---

11. Further, even if the *Handbook* were to support Aetna's position, mysteriously neither party has considered the glaring hearsay problem involved with a reference to a treatise without an affidavit or other support. It is long-established wisdom that Rule 56(e) limits this Court's consideration to *admissible* evidence, a proposition reconfirmed as recently as *Patel v. Allstate Ins., Co.,* 105 F.3d 365, 367 n. 1 (7th Cir.1997).

parties' agreements, and in particular as to whether Bridge owes Aetna $96,669 of unused liability limit from the 9/1/91–12/31/91 period to apply against the substantially larger deficit that had accrued in the previous contract year. Under the contracts' plain language, Bridge's liability for such a deficit does not extend beyond the payment of any retrospective premium due after the experience accounting carried out as of the end of the earlier contract year. Because there is no contractual ambiguity, this Court need not consider extrinsic evidence as to the parties' intent (and even if that step had to be taken, none of Aetna's proffered evidence would change the result here). Aetna and Bridge are therefore bound to comply with the plain language of the agreements into which they entered. Accordingly Bridge prevails on its Rule 56 motion as a matter of law, that motion is granted and this action is dismissed in its entirety.