**Marvin O. ROSS, Plaintiff,**

v.

**INDIANA STATE TEACHERS ASSOCIATION and Indiana State Teachers Association Insurance Trust, Defendants.**

No. 1:95 cv 245 AS.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 28, 1997.

Alan VerPlanck, James Fenton, Cathleen M. Shrader, Barrett and McNagny, Fort Wayne, IN, for Marvin O. Ross.

Wayne O. Adams, III, David D. Robinson, Johnson Smith Pence Densborn Wright and Heath, Indianapolis, IN, for Indiana State Teacher's Ass'n.

Howard E. Kochell, Barnes and Thornburg, Indianapolis, IN, Michael A. Moffatt, Bart A. Karwath, Barnes and Thornburg, Indianapolis, IN, Richard J. Darko, Lowe Gray Steele and Hoffman, Indianapolis, IN, for Indiana State Teacher's Ass'n Ins. Trust.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

### I. Procedural History

Plaintiff Marvin O. Ross ("Ross") filed his complaint in this case against the Indiana State Teachers Association ("ISTA") and the Indiana State Teachers Association Insurance Trust ("Trust") on July 27, 1995, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as well as several pendent state law claims. On February 7, 1997, this court granted summary judgment in favor of the ISTA on the ADA claim against it and dismissed the state law claims against the ISTA without prejudice, granted summary judgment in favor of the Trust on the ADA claim against it, and granted the Trust's partial motion for summary judgment on the issue of standard of review on the ERISA count. *See Ross v. Indiana State Teacher's Ass'n,* 955 F.Supp. 1025 (N.D.Ind.1997). The remaining ERISA claim was tried to the court without a jury in two trial days, April 14 and 15, 1997. Since then, in accord with the instructions of the court at the end of that trial, able and experienced counsel have filed appropriate briefs in a form requested by the court on May 27, 1997 so that this court can here and now in this fashion comply with Rule 52, Federal Rules of Civil Procedure (Fed.R.Civ.P.).

To the extent that any finding of fact is subsequently deemed to be a conclusion of law, the court adopts it as such; to the extent that any conclusion of law is deemed to be a finding of fact, the court adopts it as such. *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

### II. Facts

Beginning in 1958, Marvin Ross has suffered a degenerative condition in his right hip which has necessitated several surgeries. In 1971, Ross was hired by the ISTA's predecessor organization in Fort Wayne, the Fort Wayne Education Association ("FWEA") as its executive director, and in 1972, when the FWEA merged with the ISTA, Ross became an ISTA employee as the UniServ Director for Fort Wayne, a position which he held until December, 1994 As an employee of the ISTA, Ross was entitled to a number of fringe benefits, including long term disability insurance through the ISTA Insurance Trust, an ERISA welfare benefit plan.

In September, 1992, after experiencing increasing pain in his right hip, Ross visited the Mayo Clinic and was examined by the surgeon who had done his most recent hip surgery, Dr. Miguel Cabanela. Dr. Cabanela determined that Ross' hip was in such bad condition that Ross should be taken off work on an indefinite basis, and he opined that the condition might be permanent. In February, 1993, Dr. Cabanela performed a second total hip replacement surgery on Ross; shortly after returning home from Mayo, Ross experienced a dislocation of his hip and was forced to wear a full body cast for several months. Ross started using his sick leave through the ISTA as of September 29, 1992, and on March 29, 1993, he completed the 180 day waiting period before starting long term disability. Ross was granted long term disability benefits from period before starting long term disability. Ross was granted long term disability benefits from the Trust in March, 1993; additionally, he was granted

Social Security disability benefits in July, 1993.

Ross returned to Mayo for check-ups in August, 1993 and February, 1994. Around the time of Ross' visit in February, 1994, Dr. Cabanela received a questionnaire from the Huttleston Benefit Group ("Huttleston") the third party administrator of the Trust's long term disability plan. Dr. Cabanela reported that Ross was totally disabled, but that he could be able to do totally sedentary work if it did not require any walking or use of stairs. When Huttleston received this response, it questioned whether Ross was in fact totally disabled. Thus, a representative from Huttleston called Bruce Rogers ("Rogers"), Executive Director of the Trust, to ask if an independent medical examination ("IME") should be performed on Ross to determine if he was still disabled. At that time, in the spring of 1994, Rogers responded that he believed Ross would be returning to work and that Huttleston should wait. When Ross did not return to work by early July, 1994, Huttleston again requested permission from Rogers to have an IME performed, and this time, Rogers consented. Huttleston contacted Crawford & Company, who selected Dr. E. Michael Keating, of the Center for Hip and Knee Surgery in Mooresville, Indiana, as the physician to perform the IME. Dr. Keating examined Ross on July 25, 1994, and determined that Ross could perform work if he did not have to move very often, lift objects or climb stairs, and could use a cane full time.

Huttleston requested clarification from Dr. Keating, and Dr. Keating sent two letters on September 20, 1994, both stating that Ross could return to work so long as he could use a wheelchair to prevent him from having to get up and down too frequently. After comparing the reports from Drs. Cabanela and Keating to the ISTA standard job description for a UniServ Director and Ross' performance expectations for 1992–93, the committee of three at Huttleston determined that Ross' benefits should be terminated as he was no longer so disabled that he could not perform the substantial duties of his employment. Huttleston then contacted Rogers again to inform him of the committee's deci-

sion. Although Rogers has testified that he had to power to reverse the committee's decision, he did not do so, and thus on October 11, 1994, Huttleston sent a letter to Ross informing him that his benefits would be terminated as of October 31, 1994.

Ross then made efforts to return to work at ISTA; however, those efforts were eventually unsuccessful and resulted in his termination from employment when he failed to produce a doctor's release to work under a timetable set out by the ISTA. As a part of that effort, Ross' personal physician, Dr. Phillip Johnson, prepared a list of accommodations that would be required for Ross to return to work, and that list was later sent to Huttleston as a part of the appeals process. Dr. Johnson's letter did not persuade Huttleston or Rogers to reverse their decisions.

Originally, the Board of Trustees of the Trust was set to meet on January 6, 1995 to hear Ross' appeal; however, that date was continued because one of the teacher trustees would be unable to attend, and because the three ISTA officials who were trustees had recused themselves from the hearing due to Ross' termination, a quorum would not be present. Thus the meeting was re-scheduled for February 3, 1995. During the interim, Ross and his wife drove to Tampa, Florida to visit their daughter for a few days. Bruce Rogers had meanwhile been reviewing Huttleston's file in preparation for the appeal hearing, and he believed that Dr. Johnson's list of accommodations was inconsistent with the reports of Drs. Cabanela and Keating. He thus determined that he needed more information about Ross' true condition, and he hired a private investigator from Keenan and Associates to report on Ross' condition. Either Rogers or the investigator discovered that Ross would be traveling to Florida, and as the investigator had been unable to see much of Ross outdoors in January in Ft. Wayne, Rogers gave his approval for the investigator to follow Ross to Florida. While there, the investigator made a videotape of Ross' activities and then delivered the tape to Rogers as a part of his report.

Because of Ross' dispute with the ISTA, the Trust determined that it wanted legal counsel available for the appeal hearing, and

thus the Trust retained Attorney Richard Darko. Darko sent a letter to Ross' counsel, Wade Bosley, on December 20, 1994, informing him about the procedure for the hearing, and telling him that the hearing was intended to be a review of the information already provided to the Trust, not an opportunity to present new issues, although Ross would be allowed to speak to the Trustees if he so desired. Mr. Darko followed that with a second letter on December 22, 1994, stating that the three ISTA officials who served as Trustees had decided to recuse themselves. Darko's December 22 letter also informed Mr. Bosley that "the Administration of the Trust intends to present information in person" regarding the duties of a UniServ Director. At no time did Darko or anyone from the Trust inform Ross of the existence of the videotape prior to the appeal hearing.

On February 3, 1995, the Trustees, less the three who had recused themselves, met to hear Ross' appeal of the termination of his disability benefits.[1] Although there is conflicting testimony between the Trustees, apparently the Trustees do not receive copies of the claims information until immediately before the meeting, as the Trust considers that information to be confidential. Rogers and Maryanne Huttleston reviewed the claims information with the Trustees, and then Ross and his counsel were invited into the room. The Trustees asked Ross various questions, including how Ross spent an average day. Rogers then announced that he had a videotape showing how Ross "really spends his days." The video, which this court has reviewed, shows Ross slowly walking into and out of a grocery store, then slowly, one bag at a time, carrying groceries into his daughter's home in Tampa, Florida. After the tape was played, Doyle McAllister, Associate Executive Director for Field Services at ISTA, was given the opportunity to speak to the Trustees about the duties of a UniServ Director. This court specifically credits Ross' testimony that McAllister responded to a question from the Trustees by

answering that ISTA would do what was necessary to accommodate Ross to allow him to return to work. At no time during the hearing or during their deliberations were the Trustees informed that Ross' employment by ISTA had been terminated.

On February 21, 1995, Rogers, as Chief Executive Officer of the Trust, sent a letter to Ross informing him of the Trustees' decision affirming Huttleston's termination of Ross' benefits. The letter stated that "the Trustees made their decision in the context of the requirements of your professional position as UniServ Director, the restrictions placed upon you by your doctors and the accommodations offered by your employer as required by the Americans with Disabilities Act." The decision listed several accommodations that ISTA, through Doyle McAllister, had offered to provide, and specifically stated that the Trustees "believe that with ISTA's accommodations, you could perform the substantial duties of your employment." Thus, the Trustees denied Ross' appeal for benefits under the plan.

### III. Analysis

There is no question that the disability benefit plan is an "employee welfare benefit plan" as that phrase is defined by 29 U.S.C. § 1002, and this court has previously determined that it will review the Trustee's decision under an abuse of discretion standard as required by *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See Ross v. Indiana State Teacher's Ass'n,* 955 F.Supp. 1025, 1029–30 (N.D.Ind.1997). Thus the question presented is whether the Trustees' decision was an abuse of their discretion.

Section 1.08 of the *ISTA Insurance Trust Disability Income Benefits Benefit Plan Booklet* defines "total disability" as follows:

"Total Disability" (or Totally Disabled) for the first sixty (60) months of disability means that the participant is disabled and

---

1. Apparently the Trust did not keep a record of the proceedings at this hearing. Ross attempted to make an audiotape of the proceedings, but said tape was not offered as evidence, and there is some discussion in the record that his tape was less than complete. This court is surprised that the Trust would find it necessary to retain counsel for this hearing, but not necessary to maintain a record of the hearing.

unable to perform the substantial duties of the Participant's employment.

The Plan Booklet does not define the term "substantial duties"; however, section 11.02 of the Plan Booklet does provide that the "Plan Administrator shall have the right to interpret the terms and provisions of the Benefit Plan." Both Huttleston and the Trustees have interpreted the phrase "unable to perform the substantial duties" to include the words "with or without reasonable accommodation," and because they believed that Ross could perform the substantial duties of his employment with reasonable accommodation, his disability benefits were terminated. Ross argues that the Trustees' interpretation constitutes an abuse of discretion because it creates an additional requirement not found in the plain language of the plan.

In *Swaback v. American Information Technologies Corp.*, 103 F.3d 535 (7th Cir. 1996), the Seventh Circuit held that "if fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious." 103 F.3d at 540. The Seventh Circuit, in *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232 (7th Cir.1996), gave district courts guidance for understanding ERISA plans as follows:

> Resolving this dispute over the denial of benefits under an ERISA-governed plan requires us to apply the federal common law rules of contract interpretation. *Brewer v. Protexall Inc.*, 50 F.3d 453, 457 (7th Cir.1995); *McNeilly v. Bankers United Life Assur. Co.*, 999 F.2d 1199, 1201 (7th Cir.1993). "Those rules direct us to interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience...." *Brewer*, 50 F.3d at 457 (quoting *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir.1994)). Additionally, "when plan terms are ambiguous, we construe them strictly in favor of the insured." *McNeilly*, 999 F.2d at 1201 (citing *Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 307 (7th Cir.1992)). "A term is [only] ambiguous if it is subject to reasonable alternative interpretations." *Bechtold*

*v. Physicians Health Plan*, 19 F.3d 322, 325 (7th Cir.1994) (citing *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993)).

The question is thus whether the Trustees' interpretation is one that a person of average intelligence and experience would understand the plan to say, and the answer is clear. No average individual, upon reading the phrase "unable to perform the substantial duties of the Participant's employment," would immediately understand that to require that the Participant be unable to perform the substantial duties with or without reasonable accommodation. The reasonable accommodation requirement which the Trustees have construed is not part of the plain language of the plan, and no average individual would read it as such. Although the plan language is not ambiguous about this issue, if it were, the question would be resolved in favor of the insured, Ross. Thus, the Trustees, as plan administrator, have controverted the plain meaning of the plan, an arbitrary and capricious action.

This decision is on all fours with a decision from the Ninth Circuit, *Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455 (9th Cir.1996), in which the plan administrator read the phrase "completely unable to perform each and every duty of his regular occupation" to include "even with reasonable accommodation." The district court reversed the administrator's decision and the Ninth Circuit affirmed the district court, holding that the administrator's interpretation regarding accommodation was arbitrary and capricious. 85 F.3d at 459–60. It is clear to this court that Ross was unable to perform the substantial duties of his employment without accommodation, and possibly unable to perform those duties even with accommodation. Thus, he is entitled to have his benefits reinstated as of November 1, 1994.

The court must briefly address Ross' other arguments. The court notes that at the time of the bench trial, plaintiff proceeded on a theory that the Trustees' decision was arbitrary and capricious because a personal bias

held by Rogers against Ross had tainted the appeal proceeding or because some conspiracy between the ISTA and the Trust had influenced the proceeding.[2] Although this court specifically finds that plaintiff's testimony was credible, his beliefs as to the bias held by Rogers or an ISTA/Trust conspiracy were mere speculation. Rogers was available to testify, but was not called, and no evidence other than Ross' speculation was presented.[3] Thus, his theory is appropriately rejected.

Plaintiff has also argued that his claim was handled in a non-uniform manner because of the use of the videotape and because Huttleston requested several clarifications from Dr. Keating. Although this court does not find it overly unusual that a doctor would be asked for clarifications of his statement, the videotape and the manner in which it was presented to the Trustees certainly created an appearance of non-uniform treatment. Although the court finds that the videotape does not contradict the statements of the various doctors, the manner in which it was obtained and shown, and the fact that Ross was not notified of its existence prior to the hearing, may have rendered the hearing arbitrary and capricious, although the court need not reach that issue now.

## IV. Conclusion

Because the Trustees' inclusion of a reasonable accommodation aspect to the plan definition of "Total Disability" was arbitrary and capricious, and because Ross was clearly disabled under the plain language of the plan, this court now reverses their decision and remands Ross' appeal to the Board of Trustees to determine what benefits are due to him from the time those benefits were wrongfully terminated on November 1, 1994.

2. This court finds it striking that Doyle McAllister, a high-ranking official of ISTA, who had full knowledge of Ross' termination, appeared before the Trustees and stated that the ISTA was willing to provide the listed accommodations to Ross, but failed to inform the Trustees that Ross' employment had previously been terminated because of his failure to provide a release from his physician. Perhaps he was instructed not to mention Ross' termination, and this court has no

The clerk shall enter judgment in favor of Ross and against the Trust.

**IT IS SO ORDERED.**

way of knowing why the Trustees were not informed thereof, but McAllister's presentation to the Trustees was certainly less than candid.

3. The oft-cited passage of Rogers' deposition does not, in this court's opinion, evince any bias against Ross. Rather, it is a crass-minded individual's expression regarding Ross' attorney.