**Eddie D. CHURCH and Cherri Church, Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant–Cross–Plaintiff–Appellant,**

v.

**POWER PRESS SALES COMPANY, INC., Defendant–Cross–Defendant–Appellee.**

No. 95–1229.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1995.

Decided Jan. 19, 1996.

Roderick A. Palmore (argued), Sonnenschein, Nath & Rosenthal, Chicago, IL, Brian W. Lewis, David M. Simon, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Defendant–Appellant.

Elliot R. Schiff, Jeffrey D. Corso (argued), O'Connor, Schiff & Myers, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Plaintiff Eddie Church was injured while dismantling a large "fishbelly" crane at a closed General Motors production plant. He brought Structural Work Act and negligence claims against the new owner of the crane, American Metal Industries, the company that brokered the sale of the crane, Power Press Sales Co., Inc. ("Power Press"), and the previous owner and plant tenant, General Motors Corp. ("GM"). Subsequently, Church's claims were all dismissed on summary judgment or settled.

Before us on appeal is GM's cross-claim against Power Press seeking indemnification for attorney's fees and costs expended in defending Church's suit. GM seeks reimbursement pursuant to an indemnity provision in a November 18, 1988 contract entered into by Power Press and GM. Initially, the district court granted judgment on the pleadings in favor of GM. Upon a motion for reconsideration, however, the court reversed itself and held that the indemnity clause did not require Power Press to reimburse GM. It then granted Power Press judgment on the pleadings. GM now appeals this decision. We agree with the district court's interpretation of the indemnity provision and affirm its decision.

## I.

In 1986, GM decided to close its Willow Springs, Illinois production plant. In March 1989, GM sold the facility to United Parcel Service, but leased the building back for the remainder of the year in order to sell off certain equipment and take care of closing details. To that end, GM and Power Press had entered into a written agreement ("GM Agreement"), whereby Power Press, as a non-exclusive broker, was to find potential buyers for GM's salvageable equipment. The GM Agreement will be discussed in some detail, as it forms the basis of GM's claim.

The first section of the Agreement provided:

> Under the terms and conditions set forth in this agreement, [Power Press] agrees to sell surplus equipment for General Motors for the period commencing December 1, 1988 through January 31, 1990.

Additional terms of the contract granted GM the power to decide which equipment would be sold, to dispose of surplus equipment in "any manner it deem[ed] best," and to retain ownership and title of all equipment prior to the conclusion of a sale. All sales were subject to GM's approval, and Power Press was required to obtain written authorization

for each sale, specifying the equipment to be sold and the date by which the equipment was to be removed from the plant.

The Agreement also provided that:

[Power Press] shall be obligated to transport ... selected equipment from General Motors premises within the time designated in the disposal authorization.

Power Press was required to carry workmen's compensation insurance on its employees, and further:

If [Power Press] shall sublet any portion of the work contemplated in the agreement, [Power Press] shall require each subcontractor to accept the provisions of this article and the provisions of said workmen's compensation act or law, and shall require such subcontractors to carry workmen's compensation insurance on employees of such subcontractors.

The parties also agreed that the contract would be governed by Illinois law. Finally, the Agreement included an indemnity clause, under which Power Press was obligated to indemnify GM for:

all claims, suits, liabilities, damages, and losses, including costs, expenses, and reasonable attorney's fees through action taken by any party arising from conduct of [Power Press], its officers, agents, contractors, and employes [sic],[1] in connection with the sale of equipment, any activity related thereto, or the performance of any obligations of [Power Press] pursuant to this agreement.

Pursuant to this contract, Power Press obtained a bid from American Metal Industries ("AMI") for nine, large, overhead "fish-belly" cranes, which hung from the ceiling of the GM plant. On August 31, 1989, GM approved AMI's offer for the cranes and issued a written authorization of the sale stipulating that AMI had to remove the cranes by November 20, 1989 in order to avoid forfeiture of the cranes. Power Press completed the sale of the cranes, and an invoice dated September 20, 1989 was issued from Power Press to AMI ("AMI contract").

As reflected on the invoice, the nine "40 ton cranes" were sold on an "as is, where is, with all faults basis" for $60,000. There was no other contract or agreement between Power Press and AMI. At AMI's request, GM eventually extended the removal deadline until December 31, 1989.

AMI hired Schuette Crane Corporation ("Schuette") to dismantle the cranes and transport them to Schuette's yard for storage. Power Press was not involved in the hiring of Schuette, nor did it recommend or suggest that AMI hire Schuette to remove the cranes. Schuette then hired Central Contractor Services, Inc. ("Central") and three members of Ironworkers Union Local 1 to assist in the dismantling of the cranes. Schuette employees developed the procedure for lowering and dismantling the cranes and Schuette employees alone directed and supervised the dismantlement.

Eddie Church was one of the three Ironworkers Union members hired by Schuette. On December 12, 1989, while Church and the rest of the Schuette dismantling crew were lowering one of the overhead cranes, Church was struck by the crane and suffered serious injuries. Seeking compensation for the injuries he sustained, Church and his wife sued GM, Power Press, AMI, and Central under the Illinois Structural Work Act and for common law negligence. Schuette was later added as a third-party defendant.

Based on the indemnity provision in its agreement with Power Press, GM tendered its defense to Power Press. GM maintained that AMI, and hence Schuette (whose conduct the parties now agree was responsible for Church's injuries), were Power Press "contractors" for removal of the cranes. Therefore Power Press was obligated to indemnify GM under the Agreement. When Power Press denied this obligation, GM filed a cross-claim for indemnification against Power Press.

Eventually, the district court granted summary judgment in favor of GM, Power Press, and AMI on the issue of liability to Eddie Church. The court found none of these par-

---

**1.** As this provision is the focus of the dispute at issue and is quoted frequently, hereinafter, we will use the correct spelling of employees.

ties responsible for Church's injuries. Shortly thereafter, Church negotiated a settlement with Schuette and Central. This left only GM's claim for indemnification against Power Press unresolved. Since GM was not found liable for Church's injuries, the indemnity claim involved only attorney's fees, costs, and expenses GM incurred in defending the litigation.

Although the district court initially granted GM judgment on the pleadings, in its final decision, the court found that AMI and Schuette were not "contractors" of Power Press within the meaning of the indemnity provision. Thus the court concluded that Power Press had no obligation to reimburse GM under the Agreement and it granted judgment in favor of Power Press.

## II.

The thrust of GM's appeal is that the district court erred in finding that AMI and Schuette were not Power Press "contractors" for removal of the cranes. Before we reach the merits of GM's argument, however, we first address several preliminary issues.

## A.

■ Initially we must determine the nature of the motion presented to us for review. The district court characterized its decision as a rule 12(c) judgment on the pleadings, which we would uphold only if it appears beyond doubt that the non-movant can prove no set of facts that would support its claim for relief. See GATX Leasing Corp. v. National Union Fire Ins. Co., 64 F.3d 1112, 1114 (7th Cir.1995); Thomason v. Nachtrieb, 888 F.2d 1202, 1204 (7th Cir.1989). However, under rule 12(c), if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...." Fed. R.Civ.P. 12(c); Dempsey v. Atchison, Topeka and Santa Fe Ry. Co., 16 F.3d 832, 835–36 (7th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994). Upon review of the memorandum submitted to the

district court and the district court's opinion, it is apparent that deposition testimony, exhibits attached to summary judgment motions, additional contracts and other evidence were presented to the district court and were not rejected. The parties have directed us to similar evidence outside the pleadings on this appeal. Therefore, we find the motion presented for our review is more accurately characterized as a motion for summary judgment, and it will be treated as such.[2]

■ This being said, we generally review a grant of summary judgment de novo to determine if no genuine issue of material fact exists and the moving party must prevail as a matter of law. Fed.R.Civ.P. 56; Serfecz v. Jewel Food Stores, 67 F.3d 591, 596 (7th Cir.1995). Power Press argues, however, that the clearly erroneous standard is more appropriate in this case because the parties do not contend that there is any genuine issue of material fact, but only dispute the court's application of law to the uncontested facts. We do not agree. The clearly erroneous standard does apply to any district court factual finding drawn from undisputed underlying facts. See Cohen v. City of Des Plaines, 8 F.3d 484, 488 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994). And recently, in certain limited circumstances, we have reviewed for clear error grants of summary judgment where the court is solely applying a clear legal standard to a set of undisputed facts. See Central States Pension Fund v. Personnel, Inc., 974 F.2d 789, 792 (7th Cir.1992); see also Clarin Corp. v. Massachusetts General Life Ins. Co., 44 F.3d 471, 473 (7th Cir.1994) (recognizing application of clear error standard in certain cases, but not applying it); Jurcev v. Central Community Hosp., 7 F.3d 618, 623 (7th Cir.1993) (same), cert denied, —— U.S. ——, 114 S.Ct. 1830, 128 L.Ed.2d 459 (1994).

The determinative issues in this case, however, are matters of contract interpretation, i.e., the meaning of the term "contractor" as used in the GM Agreement and the correct

---

2. We note that Power Press agrees with this characterization, as it stated the summary judgment standard as the governing standard in its brief. GM did not propose any contrary characterization or governing standard in its opening brief, nor did GM object in its reply brief to Power Press characterizing the motion as one for summary judgment.

interpretation of the AMI contract. Traditionally, the interpretation of an unambiguous contract is a question of law.[3] *Bechtold v. Physicians Health Plan of Northern Indiana, Inc.*, 19 F.3d 322, 325 (7th Cir. 1994). Thus, we are primarily reviewing legal conclusions made by the district court and will review the case *de novo.*

## B.

The indemnity clause in the GM Agreement provides that Power Press will indemnify GM for all "costs, expenses, and reasonable attorney's fees arising from conduct of [Power Press], its officers, agents, contractors, and employees...." The district court determined that AMI and Schuette were not Power Press "contractors" for removal of the cranes within the meaning of the indemnity agreement.[4] GM asserts on appeal that the court incorrectly interpreted the term "contractor" in the GM Agreement and failed to interpret the AMI agreement in light of the GM Agreement.

■ Under Illinois law, which the parties agree governs this case, the starting point of any contract analysis is the language of the contract itself. If the language unambiguously answers the question at issue, the inquiry is over. *See Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 456 (7th Cir.) (setting forth Illinois law), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987) (applying Illinois law). In interpreting all contracts, including indemnity agreements, the paramount concern and overriding purpose is to give effect to the intent of the parties. *Higgins v. Kleronomos*, 121 Ill. App.3d 316, 76 Ill.Dec. 913, 916, 459 N.E.2d 1048, 1051 (1982). Finally, indemnity agreements are not favored in Illinois and thus are strictly construed against the indemnitee.

*Id.; Fidelity and Deposit Co. v. Rosenmutter*, 614 F.Supp. 348, 351 (N.D.Ill.1985).

■ We begin with the meaning of the term "contractor" used in the GM Agreement. The term is not defined in the Agreement, thus we look to its common and ordinary meaning. *W.E. Erickson Constr. Inc. v. Chicago Title Ins. Co.*, 266 Ill.App.3d 905, 204 Ill.Dec. 431, 434, 641 N.E.2d 861, 864 (1994). Although in the most broad and generic sense of the word, every party to a contract could be said to be a "contractor," the term is most commonly used in a more precise manner to designate one who undertakes the performance of work or services for another. *See* BLACK'S LAW DICTIONARY 326 (6th ed. 1990). This is apparent in Illinois law, which defines a "contractor" of a general contractor, or subcontractor, to mean "a party who contracts ... to do part of the work which the [general] contractor previously agreed to perform."[5] *Richard v. Illinois Bell Telephone Co.*, 66 Ill.App.3d 825, 23 Ill.Dec. 215, 233, 383 N.E.2d 1242, 1260 (1978). This definition was further elaborated on in *Rynders v. Sangamo Construction Co.*, 103 Ill.App.3d 552, 59 Ill.Dec. 600, 431 N.E.2d 1357 (1982). The *Rynders* court stated: "A subcontractor is usually a specialist whose contract ordinarily provides for the accomplishment of a particular result, the means of accomplishing such result being the choice of the sub-contractor." *Id.* 59 Ill.Dec. at 603, 431 N.E.2d at 1360 (quoting *Jones v. McDougal–Hartmann Co.*, 115 Ill.App.2d 403, 253 N.E.2d 581, 584 (1969).

GM argues that the term "contractor" should be interpreted in its broadest sense to include any party to a contract. GM has provided us with no reason, however, to conclude that this broad meaning, rather than the more common narrow meaning of the term, was intended in the indemnity provision. On the contrary, it is evident that the more narrow meaning of the term was in-

---

**3.** The parties do not claim the GM Agreement or the AMI contract are ambiguous in any way.

**4.** GM did not argue to the district court, nor did it argue before us, that AMI and Schuette were Power Press officers, agents, or employees within the meaning of the GM Agreement. Thus we do not address these possibilities.

**5.** Any "contractor" of Power Press would necessarily be a subcontractor, as Power Press was itself a GM contractor. Therefore we focus on the meaning of subcontractor.

tended when the term is viewed in light of the words that appear in the same series with it, i.e., officers, agents and employees. Each of these terms refers to persons who would perform some type of work or service for Power Press. Therefore, we find that the term "contractor," as used in the GM Agreement, means someone who was hired by or who contracted with Power Press to perform or undertake some type of specific work or service for Power Press or to reach a particular result specified by Power Press.

█ We next turn to the AMI contract to see if, given this definition of the term, AMI was Power Press' "contractor" for removal of the cranes.[6] We are persuaded that AMI was not. The contract consisted of a simple invoice issued to AMI from Power Press recording the sale of the cranes to AMI. It is a one-page document identifying AMI as the seller, noting the date of the sale as September 20, 1989, indicating that nine "40 ton cranes" were being sold for $60,000, and providing that "all equipment [would be] delivered on an 'as is, where is, with all faults basis.' " Nowhere on the invoice is there any indication that Power Press was contracting with or hiring AMI to perform removal services for Power Press or any services at all for that matter. There is nothing in the AMI agreement that specifically mandates that the cranes be removed.[7] The term "removal" is not even mentioned. The only specified result contemplated in the contract is the payment of $60,000 for nine cranes. On its face, then, the invoice represents that a sale was completed and nothing more.

The contract reflects no mutual understanding that AMI was performing a job for Power Press, let alone a recognition that AMI was undertaking a portion of Power Press' contractual obligations to GM. The intent of AMI and Power Press was manifestly to engage in a sale; there is no evidence of any intent to enter into a contract for services. The fact that the cranes were sold "as is, where is" does not transform an ordinary sales contract into a contract *for* removal services.

Moreover, the invoice does not provide for any payment from Power Press to AMI for removal services, which one would expect if AMI was actually contracting to perform those services. Nor is there any evidence that the price of the cranes was discounted or adjusted to account for removal services AMI was to perform for Power Press. That there was no discount is supported by the fact that the purchase money went directly to GM, and GM approved the price. It is unlikely that GM would approve a discounted price to pay for a service that Power Press was contractually obligated to perform.

Finally, the AMI sales contract failed to mention that AMI agreed to the terms of the GM Agreement or that AMI promised to obtain worker's compensation insurance, both of which Power Press was required to assure if it subcontracted any portion of its obligations. GM did not balk at this deficiency when it approved the sale of the cranes. We thus conclude that Power Press and AMI did not contract for the removal of the cranes, but rather completed a straightforward sale.

Once AMI fulfilled its one contract obligation to Power Press by paying GM $60,000, it then, as owner of the cranes, hired Schuette to dismantle and remove the cranes. Thus it was not a Power Press "contractor" whose conduct caused GM to incur attorney's fees, costs and expenses, and hence Power Press has no duty to indemnify GM under their Agreement.

GM argues that any reading of the indemnity provision and the AMI contract that excludes AMI and Schuette as Power Press

---

**6.** Power Press' indemnity obligation arises only if GM's costs are incurred due to the conduct of a Power Press contractor (or officer, agent or employee). Therefore GM must show that Schuette was a Power Press "contractor." Yet in order to link Schuette to Power Press, AMI must be linked to Power Press as a contractor. Hence, the discussion will focus on whether AMI is a Power Press contractor, as this is the first hurdle GM must clear.

**7.** As Power Press points out in its brief, although the cranes were sold "as is, where is" and AMI would have to remove them if it wanted to reuse them, it is possible that AMI just wanted certain parts from the cranes and could have simply stripped the cranes and forfeited the remainder.

contractors ignores the fundamental nature of Power Press' agreement with GM. GM maintains that Power Press had two obligations under its agreement with GM: 1) to sell surplus equipment and 2) to remove it from GM's premises. GM claims the removal obligation flows from the transport provision, which states that "Power Press shall be obligated to transport ... selected equipment from general motors premises...." In light of these pre-existing obligations, GM contends that Power Press' sale of the cranes to AMI "as is, where is" should be read as a sale *and* a subcontract for removal services. GM essentially asks us to interpret the AMI sale from the perspective of GM and the GM Agreement.

Although GM's argument has some intuitive appeal, we are confident that our reading of the indemnity provision and the AMI contract is correct. First, we remain unconvinced that Power Press was under an obligation to GM to remove the cranes at issue. The GM Agreement states that Power Press is obligated to transport "selected equipment" from GM's premises; it does not say Power Press is obligated to transport or remove all surplus equipment it sells. There is no evidence demonstrating that the cranes at issue were "selected" by GM for transport or removal by Power Press. If Power Press was not under any obligation to remove or transport the cranes, then GM's argument must fail, since there would be no reason to impute a subcontract for removal into the AMI sales contract.[8]

Moreover, even assuming that Power Press was under a contractual obligation to transport all surplus equipment it sold, we are still persuaded that AMI was not a Power Press contractor. It is true that the GM Agreement must be our starting point. However, in order to determine whether AMI is a Power Press contractor under that Agreement we must focus on the separate relationship between Power Press and AMI. The AMI contract must support the conclusion that AMI agreed to perform or undertake removal services for Power Press. We

have already determined that it cannot not do so.

Unfortunately for GM, the nature of Power Press' obligations to GM cannot transform the contract between Power Press and AMI into something it is not. Although from GM's perspective and the standpoint of the GM Agreement, AMI might have been fulfilling a Power Press obligation by removing the cranes, this is insufficient to convert AMI's purchase into a removal contract. AMI must have *intended* to become a Power Press contractor for such a relationship to exist; this intent cannot be implied from the separate GM/Power Press relationship. GM cannot impute to AMI and Power Press a relationship or obligation intended by neither, simply based on the separate obligation of Power Press to GM. Therefore we cannot adopt GM's argument.

GM also argues that construing the indemnity provision in this manner renders the clause meaningless, which violates established rules of contract interpretation. We cannot agree. First, because GM's approval was required for the terms of each sale, GM could have afforded the clause meaning by rejecting any "as is, where is" sale and instead insisting that Power Press be responsible for the removal of all equipment. GM had the power and the ability to easily protect its indemnity rights. In addition, the clause would not be meaningless in the situation where a buyer rejected any "as is, where is" agreement and required Power Press to handle the removal and transport activities.

Finally, GM attempts to argue that Power Press must indemnify GM for any activity related to the sale and removal of the cranes, regardless of whether the party whose conduct caused the accident was Power Press' officer, agent, contractor, or employee. GM can make this argument only by changing the words of the indemnity provision. Instead of quoting the provision as written, i.e., that Power Press must indemnify GM for costs:

---

**8.** We also note that the fact that the cranes were sold "as is, where is" is just as consistent with Power Press having no contractual obligation to remove the cranes as it is with Power Press

having that obligation. By selling the cranes in this fashion, Power Press could neatly and quickly complete its one obligation—the sale—and leave AMI to work out the removal with GM.

arising from conduct of Power Press, its officers, agents, contractors, and employees, in connection with the sale of equipment, *any activity related thereto,* or the performance of any obligations of [Power Press] pursuant to this agreement (emphasis added)

GM proposes we add a word to the provision and quotes the provision so that Power Press must indemnify GM for all costs:

arising from the conduct of Power Press, its officers, agents, contractors, and employees ..., *[and]* any activity related [to the sale of the equipment], or the performance of any obligations of the contractor pursuant to this agreement (emphasis added).

We are troubled by GM's misreading of the contract, which could have misled the court. However, it is perfectly clear to us, as it was to the district court, that under the clause, as written, Power Press has no obligation to indemnify GM if the party that caused the harm was not a Power Press agent, officer, employee, or contractor.

### III.

The unambiguous language of the GM indemnity clause and the AMI sales contract demonstrate that AMI and Schuette were not Power Press contractors for removal of the cranes. Thus, Power Press has no obligation to indemnify GM for its attorney's fees and costs expended in defending Eddie Church's claims. The district court's decision is AFFIRMED.