In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 01-1371, 01-1538 & 01-2909

JUDITH ALTER KALLMAN,

*Plaintiff-Appellee*
*Cross-Appellant*,

*v.*

RADIOSHACK CORPORATION, F/K/A
TANDY CORPORATION,

*Defendant-Appellant*
*Cross-Appellee*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 490—**Matthew F. Kennelly**, *Judge.*

ARGUED FEBRUARY 21, 2002—DECIDED DECEMBER 19, 2002

Before FLAUM, *Chief Judge*, and HARLINGTON WOOD, JR.
and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In this breach of lease action,
the district court ruled that Radioshack was liable for
damages stemming from its guaranty of a lease between
one of Judith Kallman's companies and Color Tile. In
this appeal, Radioshack challenges the district court's
ruling that Radioshack is liable for Color Tile's breach, that
it is responsible for the cost of repairs to the property, and
that it must pay attorneys' fees. Kallman cross-appeals,

attacking the district court's ruling that she did not mitigate her damages. We affirm the decision of the district court.

## I.  BACKGROUND

### A.  Lease interests in the property

This case concerns Color Tile's abandonment of commercial property at 1224-26 Ogden Avenue in Downers Grove, Illinois, and Radioshack's guaranty of Color Tile's lease. An understanding of the history of the series of leases controlling the property is central to resolving Radioshack's claims. In 1959, All-States Ohio, Inc. leased the property to Robert Hall Clothes, Inc. In 1964, Morgan Trust Company gained title to the property, and the Robert Hall lease continued. In 1973, Robert Hall subleased the property to Parknat Properties, Inc., which was controlled by Irwin Kallman. A year later, Parknat sub-subleased the property to Color Tile, Inc. Color Tile in turn leased 3,200 square feet of the 8,500-square-foot building to T.J.'s Restaurant and Pancake House, Ltd.

Color Tile's sub-sublease with Parknat, dated February 5, 1974, was for a term of 15 years with the option to renew for a ten-year term. At the time it terminated its lease, Color Tile paid $9.85 per square foot monthly to lease the property. Radioshack guarantied all of Color Tile's obligations to Parknat under the lease.

In 1977, Robert Hall, the original lessee, filed for bankruptcy. As a result, Robert Hall's parent company entered into an agreement with all of the owners and subtenants of property leased by Robert Hall. The agreement, dated October 14, 1977, cancelled the Robert Hall lease and transferred Robert Hall's interests to Morgan, the owner of the property, subject to the rights of all the subtenants. Under the agreement, the subtenants (in-

cluding Parknat) would release Morgan and Robert Hall of their obligations under the subleases if Morgan entered into a new lease with the subtenants. Morgan then entered into a lease with Parkvan Properties, Inc., Parknat's sister company. (It did not enter into a new lease with Parknat.) Notwithstanding the substitution of Parkvan for Robert Hall, Color Tile continued to occupy the premises under the Parknat sub-sublease. In 1988, ten years after Robert Hall declared bankruptcy, Color Tile exercised its option to renew the lease for a term that was to end on April 30, 1999.

In February of 1996, more than three years before its lease was to expire, Color Tile filed for bankruptcy, abandoned the premises, and stopped paying rent. T.J.'s Restaurant remained in possession of its premises when Color Tile defaulted. Judith Kallman[1] took over possession of the Color Tile property through her agent and management company, Win Properties, Inc.

B.  Kallman's actions to lease the property after Color Tile vacated

Win learned of Color Tile's abandonment of the property on February 15, 1996. In March, Win entered into a month-to-month lease with T.J.'s for its portion of the property. Win also sought the assistance of a real estate broker, Nick Peters, to lease the Color Tile property. In March of 1996, Peters sent Win a marketing proposal that included a review of the property and an analysis of the market conditions. In the proposal Peters suggested a

---

[1] In 1986, both Parkvan and Parknat assigned their interests in their respective leases to Irwin Kallman. Mr. Kallman, in turn, transferred these interests to his wife Judith Kallman, who became the owner of the property in 1988 when she received a quitclaim deed to the property.

general cleanup and repair of the property and noted that in the property's current unimproved state it would likely rent for between $8-$9 per square foot. In spite of first receiving a marketing proposal from Peters in March, Win did not return the finalized Listing Agreement until July 17, 1996, more than five months after Color Tile vacated the property. Prior to finalizing the agreement, Win's internal leasing department mailed advertisements for the property to 500 brokers and prospective tenants and advertised the property in a national retail housing publication, but no sign was posted on the property and Win did nothing to list the property locally.

After the listing agreement was finalized, Peters put up a sign on the property, sent a brochure to prospective tenants and other brokers, and showed the vacant property to prospective tenants. Among other issues, negotiations with potential tenants focused on the condition of the property and the lease price. In spite of Peters's advice, Win's agreement with Peters instructed him to seek $12 per square foot for the property. Win also decided it would not perform repair work on the property, but would negotiate these and other improvements with prospective tenants along with rent and the lease term as part of general contract negotiations. On October 15, 1998, more than two years after Color Tile abandoned the property, Win finalized a lease with a company named Happiness is Pets for $11 per square foot.

In order to close lease negotiations with Happiness is Pets and finalize a new lease term with T.J.'s, Win made several repairs to the Ogden property. Among other repairs, Win hired contractors to replace the roof, resurface the parking lot, and replace two deteriorated heating, ventilation, and air conditioning (HVAC) units.

C.  District court proceedings

Kallman timely initiated this suit against Radioshack as Color Tile's guarantor for costs associated with Color Tile's breach of the lease agreement. Kallman sought damages for lost rent and real estate taxes due under Color Tile's lease obligations and costs for replacement of the roof, HVAC units, and parking lot allegedly neglected by Color Tile in violation of the lease. Both Kallman and Radioshack moved for summary judgment in the district court.

In an opinion and order dated March 9, 2000, the district court granted summary judgment in favor of Kallman on the issue of liability, concluding that the cancellation of the Robert Hall lease did not affect Parkvan's interest and Radioshack's guaranty still covered the Color Tile lease. The district court denied Kallman's motion with respect to damages, reserving for trial the issues of whether repairs made to structures on the property were chargeable to Radioshack and whether Kallman had satisfied her duty to mitigate damages. *Kallman v. Tandy Corp.,* No. 99 C 490, 2000 WL 283074, at *6-8 (N.D. Ill. Mar. 9, 2000).

After completing a five and one-half day bench trial, the district court found Kallman was entitled to the costs of repairing the roof, HVAC units, and parking lot. *Kallman v. Tandy Corp. and Radio Shack Corp.,* No. 99 C 490, slip op. at 16-20 (N.D. Ill. Jan. 16, 2001). The court found Kallman was not entitled to these damages as mitigation costs, as the repairs were undertaken more than two years after Color Tile's breach, but was instead entitled to them because they were caused by Color Tile's failure to keep the items in good repair as required by the lease. The court further ordered Radioshack to pay damages for rent and other expenses unpaid by Color Tile, but reduced that amount after finding that Kallman failed to adequately

mitigate her damages. Specifically, the court pointed to the delay in hiring a realtor, Win's refusal to improve the property, and the asking price of the property as evidence of her failure to take reasonable measures to mitigate her damages. Finally, the court awarded Kallman attorneys' fees under the terms of the Color Tile-Parknat lease.

On appeal, both parties challenge the district court's findings. Radioshack claims that it is not liable for Color Tile's breach, that the repairs to the property were not Color Tile's responsibility under the lease, and that the attorneys' fees awarded were unreasonable. Kallman appeals the district court's reduction of damages based on her failure to mitigate damages.

## II.  ANALYSIS

### A.  Radioshack's liability for Color Tile's breach

We review *de novo* the district court's grant of summary judgment for Kallman. *Bristol-Myers Squibb Co. v. Ikon Office Solutions, Inc.*, 295 F.3d 680, 683 (7th Cir. 2002). We note that interpretation of the terms of an unambiguous contract is traditionally a question of law and is particularly suited to disposition on summary judgment. *Church v. General Motors Corp.,* 74 F.3d 795, 799 (7th Cir. 1996); *Bechtold v. Physicians Health Plan of N. Ind., Inc.*, 19 F.3d 322, 325 (7th Cir. 1994). In this diversity action, both parties agree that Illinois law governs their claims.

Radioshack argues that under the 1977 agreement, when the lease between Morgan and Robert Hall terminated, the sub-sublease between Parknat and Color Tile terminated as well, thus relinquishing Radioshack from any responsibilities as guarantor. The district court found that under the terms of the agreement, Parknat's interest in the property remained, thereby preserving Radioshack's guaranty. We agree with the district court.

Radioshack's claim is misplaced in light of the language in the 1977 agreement preserving the interests of the subtenants, including Parknat and Color Tile. Under Illinois law, resolution of issues of contract dispute starts with an analysis of the terms of the contract. *See*, *e.g.*, *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1994). "If the language [of the contract] unambiguously answers the question at issue, the inquiry is over." *Church*, 74 F.3d at 799.

Two paragraphs of the 1977 agreement plainly indicate that when the Robert Hall lease was cancelled, the rights of the subtenants were to be preserved. First, paragraph two of the agreement states that the agreement was made "subject to" the rights of the subtenants:

> Each Tenant shall release, relinquish and surrender all of its right, title and interest in and to its Lease and shall surrender vacant possession of its Premises (except the Subleased Premises) to Morgan or the respective Landlord within seven days after the date when Tenant shall have regained possession of said Premises from any persons now occupying such Premises, but in no event earlier than the closing date to be determined in accordance with Article 9 of this Agreement. . . . Possession of the Subleased Premises shall be delivered *subject to* any rights of the Subtenants. (emphasis added)

Under Illinois law, we give clear and unambiguous contract terms their plain meaning. *Srivastava v. Russell's Barbecue, Inc.*, 523 N.E.2d 30, 33 (Ill. App. Ct. 1988). Here, the term "subject to" is not ambiguous. *Englestein v. Mintz*, 177 N.E. 746, 752 (Ill. 1931) (finding the term "subject to" was not ambiguous and noting that the term ordinarily means "subordinate to" or "limited by"). This section clearly indicates that the purpose of the agree-

ment was to preserve the status quo while removing Rob-
ert Hall from the chain of leases. *See Omnitrus*, 628 N.E.
2d at 1168 (courts must determine the intention of the
parties from the plain language of a clear and unambiguous
contract).

Paragraph thirteen of the agreement further supports
this understanding. It states that cancellation of the sub-
tenants' rights under the lease was conditioned on Morgan's
execution of new leases with various subtenants—a condi-
tion that did not occur:

> Subtenants, upon the condition hereinafter set
> forth having been satisfied, consent to the Cancella-
> tion of the Leases covering the Subleased Prem-
> ises . . . provided, however, that such consent and
> release by the Subtenants shall be and become
> effective only if prior to the closing the following
> condition is satisfied: that the various Subtenants
> and Morgan and such Landlords shall have entered
> into new leases in respect of each of the Premises
> on terms and conditions satisfactory to such Sub-
> tenants and Morgan and such Landlords. . . . *If
> the condition is not satisfied prior to the Closing . . .
> the foregoing consent and release shall be of no
> force or effect, the Subtenants in such events reserv-
> ing any and all rights and remedys [sic] which any
> such Subtenant may have at law or in equity. . . .*
> (emphasis added)

Under this paragraph, subtenants would agree that their
leases were cancelled *provided that* prior to the closing
of the agreement, the existing subtenants entered into a
new agreement with Morgan. Morgan entered into a new
lease with Parkvan, not Parknat, and the condition of
paragraph thirteen was not fulfilled. Thus, the agreement
provides that the rights of the subtenants were unaf-
fected. Nothing in the agreement suggests that any of the
subtenants agreed to give up their rights if Morgan leased

the properties to some other subtenant. Both sections of the agreement relevant to the Parknat-Color Tile lease, paragraph two and paragraph thirteen, clearly preserve the status of the subtenants under the unambiguous terms of the contract.

That Morgan executed a new lease with Parkvan rather than Parknat did not eliminate Parknat's interest in the property. Parknat, after all, was a subtenant under the agreement and, as discussed above, the termination of the lease agreement between Morgan and Robert Hall was subject to the preservation of Parknat and Color Tile's sublease. Therefore, the cancellation of the Robert Hall lease and substitution with Parkvan did nothing to affect Parknat's interest in the property. Nothing in the agreement indicates that the parties were trying to do anything more than to excise Robert Hall from the chain in the agreement; all of the references in the agreement to subtenants point to a careful and unambiguous preservation of their rights. Because Parknat's interest in the property remained the same, Radioshack's responsibilities as guarantor were preserved.

In order to counter the plain language of the contract, Radioshack seeks to use Irwin Kallman's deposition testimony to show that the parties intended to cancel the existing subleases when they entered into the 1977 agreement. Where, as here, the terms of the contract are not ambiguous, its construction is to be determined from the four corners of the agreement. *See Englestein*, 177 N.E. at 752 ("[B]efore a court may look at the surrounding circumstances there must be ambiguity in the language of the instrument."). Consideration of any statements made by Irwin Kallman as to the intent of the parties making the agreement is squarely prohibited by the parol evidence rule. *See, e.g.*, *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999).

Radioshack also argues that the termination of the Morgan-Robert Hall lease cancelled the Parknat-Color

Tile lease as a matter of law. It points to Illinois cases holding that if a lease is cancelled, then any subleases are deemed cancelled by operation of law. *Arendt v. Lake View Courts Assocs.*, 366 N.E.2d 1096, 1097-98 (Ill. App. Ct. 1977). But the present case is easily distinguished from those cited by Radioshack, where no effort was made when cancelling the leases to preserve the rights of sub-tenants. Here the parties have specifically included language in the contract to preserve those rights. *See Consol. Coal Co. v. Savitz*, 1894 WL 3048, at *4 (Ill. App. Ct. 1894) (language of lease controls notwithstanding general rule of law as to appurtenances). Similarly, the 1977 agreement did not cause an express surrender or surrender by operation of law. Parkvan took no actions to threaten Parknat's right to continue to sub-sublease the property, and no legal principle prevents Parkvan from permitting the Parknat-Color Tile sublease to remain in effect. *See Williams v. Vanderbilt,* 34 N.E. 476, 477 (Ill. 1893) (listing ways lease can be surrendered). Accordingly, we affirm the district court's granting of partial summary judgment in favor of Kallman finding Radioshack liable for damages resulting from Color Tile's breach of the Parknat sub-sublease.

### B.   Damages for failure to maintain the property

Radioshack also claims that the district court erred in awarding damages to Kallman for the cost of replacing the roof, repaving the parking lot, and replacing two HVAC units. The district court found that the amounts spent to repair the property were due under the terms of the lease. Under Illinois law, we review the district court's construction of the lease terms *de novo*, *Anest v. Bellino*, 503 N.E.2d 576, 578 (Ill. App. Ct. 1987), and its award of damages for clear error. *See Pioneer Trust and Sav. Bank v. Zonta*, 421 N.E.2d 239, 245 (Ill. App. Ct. 1981).

Radioshack proposes that the Color Tile-Parknat lease includes only a general covenant to repair on behalf of Color Tile and that the repair and replacement of the roof, parking lot, and HVAC units does not fall within the terms of the lease. This argument is belied by the unambiguous terms of the lease, which place responsibility to make structural repairs, including to the roof, on Color Tile. Color Tile's responsibility for the roof is explicitly listed in Section 5:01 of the Color Tile-Parknat lease:

> Lessee shall, at its own expense, keep all buildings or improvements now or hereafter placed on the demised premises during the lease term in good order and repair; *Lessee shall be liable for repair to the roof and for any structural failure of the building. . . .* Lessee shall pay all costs of any alterations and additions. . . . (emphasis added)

Further, the requirements that Color Tile keep the building and "improvements placed on the demised premises" in good repair and shoulder the burden for "structural failures" encompass repairs to the parking lot and heating and cooling units. *Hollywood Bldg. Corp. v. Greenview Amusement Co.,* 43 N.E.2d 566, 568 (Ill. App. Ct. 1940) (finding that a lease requiring the lessee to make repairs, "structural or otherwise," bound the lessee to pay costs for significant changes to outside of building). Both the parking lot and the HVAC units are part of the premises leased by Color Tile, and both are either physically attached or connected to the building itself. Under the clear and unambiguous terms of the lease the responsibility for the repair to these structures fell on Color Tile. *Hardy v. Montgomery Ward & Co.*, 267 N.E.2d 748, 751 (Ill. App. Ct. 1971) ("Where the parties to a lease of real property have expressly covenanted as to repairs, the express covenant . . . becomes the measure of liability of the respec-

tive parties.").[2] We need look no further than the terms of the contract to determine that Radioshack is properly liable for damages caused by poor upkeep of the roof, parking lot, and HVAC units, as none of these are beyond its responsibility for "structural failures" or the upkeep of the premises.

Comparison to Illinois case law regarding covenants of good repair only strengthens our reading of the Color Tile-Parknat lease. Under Illinois law, a general covenant to repair does not require a lessee to make repairs involving structural changes. *See*, *e.g.*, *Hardy,* 267 N.E.2d at 751. Radioshack points in particular to *Sandelman v. Buckeye Realty, Inc.*, 576 N.E.2d 1038 (Ill. App. Ct. 1991) as support for its argument that repairs in this case are not covered under the lease. In *Sandelman*, the court found a landlord liable for repair to a roof when the lease imposed a general covenant to repair on the tenant. *Id.* at 1040. However, *Sandelman*, like the rest of the cases regarding general covenants to repair, is readily distinguished from this case. The *Sandelman* court noted the absence of any language pertaining to the roof in that case and stated that "[i]n order to shift to the tenant a burden which would naturally fall on the landlord, the warrant for the change should be plainly discoverable in the lease." *Id.* The language requiring that burden be placed upon the lessee is plainly discoverable in the lease in this case. Given the language in the contract, the costs of repairing and replacing the roof were not unforeseen to Color Tile

---

[2] Radioshack argues that the order of the district court dated March 9, 2000, is inconsistent with its final ruling finding Radioshack liable for the damages. In this order, entered before the bench trial, the court did not rule that these damages were not covered by the lease. Rather, the court properly reserved judgment on this issue until it was able to hear the evidence at trial.

at the time it signed the lease.[3] *Koenigshofer v. Shumate*, 216 N.E.2d 195, 196 (Ill. App. Ct. 1966) (finding that the classification of repairs as "structural" depends more on the foreseeability of the repairs than their physical characteristics).

Next, Radioshack argues that the terms of the lease require Color Tile only to repair, not replace, structures such as the roof. However, this argument misstates the reason for its liability. Color Tile's breach of its duty to repair caused the structures to deteriorate to the degree that required replacement. As the district court noted, because the need to replace the roof stemmed directly from Color Tile's breach, the damages recoverable by Kallman include the cost of replacing the roof. Similarly, the district court found that Color Tile's failure to properly repair the parking lot and HVAC units caused them to deteriorate to a level that required replacement. Under the terms of the lease, Kallman may properly recover for this breach. *Barnhart v. Boyce*, 1902 WL 1900, at *7 (Ill. App. Ct. 1902) (finding that lease terms obligated lessee to make repairs during the lease term that would prevent premises from deteriorating in value).

Finally, Radioshack argues that the evidence presented during the bench trial did not support the district court's finding that Color Tile's failure to maintain the property caused the poor conditions that necessitated

---

[3] Radioshack claims that replacement of the roof, parking lot, and HVAC units are more properly considered "capital improvements" and are not covered by the duty to repair of Section 5:01. The only support offered by Radioshack for this characterization is that Win's ledgers for the Ogden Avenue property recorded the expenses as capitalized for purposes of Win's federal income tax returns. Despite Win's possible 1998 accounting, the nature of the repairs and the terms of the lease convince us that these repairs were Color Tile's responsibility.

repair. To recover, Kallman must show both breach of the lease agreement requiring repair and resultant damages. *First Nat. Bank of Des Plaines v. Shape Magnetronics, Inc.*, 481 N.E.2d 953, 955 (Ill. App. Ct. 1985). Color Tile leased the property beginning in 1974, and Radioshack has made no argument that the damages pre-dated the beginning of the Color Tile lease.[4] Further, sufficient evidence existed regarding the neglect of each of the structures to support the court's ruling that Color Tile was responsible for their repair.

At trial, Kallman presented testimony regarding the condition of the roof. According to the roofing contractor, repairs made to the roof during the Color Tile tenancy were inadequate and accelerated the deterioration of the roof. Patches upon patches (sometimes up to seven thick) were placed on the roof, exacerbating weather damage and leaving Kallman little choice but to replace the roof. The court credited the testimony of the roofing contractor, who testified that it would take at least five to ten years for the roof to deteriorate to such a state.

Next, the parking lot contractor testified that it would have taken five years for the parking lot to reach the state of disrepair it was in when Color Tile abandoned the property. Problems with the parking lot included numerous potholes, significant cracking, and drainage problems. Although Radioshack points to a higher 1998 repair estimate to argue that the poor condition of the parking lot may have been exacerbated by the two years it lay vacant, Kallman claims a 1996 estimate relied on by

---

[4] Further, Section 19:02 of the lease states, "[T]he Lessee represents that it has examined the premises and is fully satisfied with the physical condition thereof; and that the taking of possession of the demised premises by the Lessee shall be conclusive evidence that Lessee accepts same 'as is.'"

Radioshack does not adequately reflect the level of repair needed. We will not disturb the district court's evaluation of this possibly conflicting evidence.

Finally, the HVAC contractor's 1996 estimate reported that the HVAC units had not be serviced in three to five years, that they had rusted heat exchangers and pilots, and that they could not be repaired feasibly. The district court had sufficient evidence to link the poor condition of these units to Color Tile's tenancy.[5] Therefore we affirm the district court's finding of damages for the replacement of the roof, HVAC units, and parking lot.

C.  Kallman's failure to mitigate damages

Illinois law requires a landlord to "take reasonable measures to mitigate the damages recoverable against a defaulting lessee." 735 Ill. Comp. Stat. 5/9-213.1 (1992). Kallman argues that she made reasonable efforts to relet the property, which is all that is required, and that the district court erred when it found otherwise. Radioshack counters that the district court's finding was correct in light of the evidence indicating that Kallman's asking rental rate combined with the condition of the property frustrated the effort to find a replacement tenant.

As an initial matter, we note the deference with which we review the district court's finding that Kallman did not

---

[5] Radioshack proposes that Section 13:01 of the lease, which requires Color Tile to surrender the property in the same condition as it was in when Color Tile took possession with reasonable wear and tear excepted, means that damage to the roof, parking lot, and HVAC units is exempted under the lease. The district court found that the extensive damage and poor condition of the roof, parking lot, and HVAC units did not constitute "reasonable wear and tear," and we agree.

act reasonably. *Etter v. J. Pease Constr. Co.*, 963 F.2d 1005, 1008 (7th Cir. 1992) (noting that deferential review of mixed questions of law and fact is warranted when the district court is better positioned than the circuit court to decide the issue in question). Based on the evidence presented at trial, the court concluded that essentially three factors contributed to the two and one-half year delay in leasing the property: (1) Win took almost five months to conclude a listing agreement with a realtor; (2) Win delayed improvements to the property and insisted they be negotiated as terms of a new lease; and (3) Win, contrary to the advice of its realtor, bargained for rental rates higher than Color Tile was paying for the unimproved property. We find no clear error by the district court in its holding that these factors, along with the resulting two and one-half year delay in leasing the property, did not constitute reasonable measures to mitigate damages.

The district court found that Win's decision not to place the property in a "vanilla box" condition,[6] in combination with its target of a higher rental range, deterred potential tenants from entering into a new lease. Win's real estate agent, Nick Peters, recommended making improvements to the property, noting in a March 19, 1996 marketing proposal that "a general clean up and repair should be conducted throughout the vacant portion of the property." *Kallman,* No. 99 C 490, slip op. at 6. Peters specifically noted that these improvements would "enhance

---

[6] A "vanilla box" is a term used in the real estate business to describe a property that has drywall walls that are sanded and ready to be primed, a drop ceiling with lighting, a concrete slab floor ready to be finished, a restroom with fixtures, electrical lines, and rooftop HVAC units. *Kallman v. Tandy Corp. and Radio Shack Corp.*, No. 99 C 490, slip op. at 14 (N.D. Ill. Jan. 16, 2001).

the leasibility of the property." *Id.* Win chose not to complete these repairs, instead insisting on negotiating improvements to the property, along with other lease terms, with perspective tenants. Although the rule of mitigation does not require a landlord to create the best letting conditions possible, a landlord must take reasonable steps to re-lease the property after breach. MILTON R. FRIEDMAN, FRIEDMAN ON LEASES, §16.303 (4th ed. 1997) (a landlord when reletting to minimize his damages does not have the same freedom of choice that is available to him when he selects a tenant for his own account). We do not find that, as a matter of law, lessors must "vanilla box" or make extensive repairs to property in order to satisfy their duty to mitigate. But in this case, where the parties have offered conflicting evidence as to the effect of the lack of "vanilla box" work on the interior of the property, we will not disturb the district court's factual finding that poor conditions of the property contributed to the delay in finding a new tenant.

The district court also found that Kallman disregarded the advice of her broker and solicited rental rates higher than those paid by Color Tile. Win's contract with Peters directed him to seek a rental rate of $12 per square foot, despite Peters's recommendation that, based on market conditions and the condition of the property, he expected the property in its unimproved state to rent for $8-$9 per square foot. The district court did not find the statement of Win's representative that it was willing to come down to the price range recommended by Peters to be credible given the evidence of Win's tough and far-sighted bargaining tactics. "When it obtained reasonable proposals from realistic prospects, Win's strategy was to negotiate in an effort to maximize Kallman's long term return, both by having as high a starting rental rate as possible, and by securing a lease for a term extending well beyond the term of Color Tile's lease." *Kallman,* 99 C 490, slip op. at

14. Win's attempt to obtain higher rent at the expense of reletting the property is strong, although not conclusive, evidence that its efforts were not reasonable. *MBC, Inc. v. Space Ctr. Minn.*, 532 N.E.2d 255, 261 (Ill. App. Ct. 1988) (landlord failed to mitigate damages because it attempted to re-rent the premises at significantly higher rates than it had been charging the previous tenant).[7] Again, we do not find that attempts by a landlord to maximize the amount of rent collected from a new tenant per se indicate unreasonable efforts to mitigate damages, but in this case, given the poor condition of the property, delay in engaging a broker, and other restrictive terms of the lease, it was not clear error for the district court to find the efforts unreasonable here. The district court's finding that it was unreasonable for Kallman to take more than five months to execute a standard agreement with a real estate agent, although by itself insufficient to find a failure to mitigate damages, further supports its ruling that Kallman's efforts, when taken as a whole, were

---

[7] Kallman argues that the district court erred when it compared the rental rates sought by Win to those paid by Color Tile because the new rates were "gross" figures and did not include the benefits to Win of the "triple net" lease terms held by Color Tile. Win seems to imply that if the benefits to Win of Color Tile's lease terms were factored into the rental rates offered to prospective replacement tenants, those rates would be effectively lower or comparable to Color Tile's rates. But this argument is a red herring; Kallman's explanatory calculations showing the benefits offered to prospective tenants include discounts for expenses claimed by Kallman here, including the cost of repairing the roof and the parking lot. Kallman cannot recover twice for these damages. Further, Kallman's actions taken together—not a term-by-term comparison of prospective lease terms—resulted in a two and one-half year delay in renting the property and justify the district court's finding that Kallman failed to mitigate her damages.

unreasonable. We affirm the district court's ruling that Kallman failed to mitigate her damages and affirm the resulting limitation of her damages.

D.  Attorneys' fees and costs

Finally, Radioshack claims that the costs and fees awarded to Kallman were unreasonable. Radioshack claims that an award of costs was improper because Section 18:06 of the Color Tile-Parknat lease only provides for reimbursement of attorneys' fees.[8] However, even if Section 18:06 may not be read to include costs, they were properly awarded under Section 14:01(C) of the agreement, which provides for reimbursement for "[a]ny other amount necessary to compensate the Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under the lease or which in the ordinary course of things would be likely to result therefrom." *See Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 520 (7th Cir. 1999). Further, despite Radioshack's argument that counsel's bills were insufficiently itemized, there is no evidence that these bills were unreasonable. Kallman incurred the expense for her counsel's services and paid their bill. This is strong evidence of commercial reasonableness, which is all that is required under an indemnity clause such as the one at issue here. *Id.*; *Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996). The district court's award of fees and costs is affirmed.

---

[8] Section 18:06 of the lease provides that: "[i]f, on account of any breach by the parties hereto of their obligations hereunder, it shall become necessary for either party to employ an attorney to enforce or defend any of its rights or remedies hereunder, and should such party prevail, it shall be entitled to any reasonable attorney's fees incurred in such connection."

## III. CONCLUSION

For the foregoing reasons, the district court's rulings on the issues of liability, damages, and attorneys' fees are AFFIRMED.

A true Copy:

       Teste:

                 _____

                 *Clerk of the United States Court of*
                 *Appeals for the Seventh Circuit*